[No. 29822.  *En Banc.*  December 27, 1946.]

THE STATE OF WASHINGTON, *Respondent,* v. FRED GRENZ, *Appellant.*[1]

[1]Reported in 175 P. (2d) 633.

*M. E. Mack,* for appellant.

*C. C. Quackenbush* and *Chester Chastek,* for respondent.

MALLERY, J.—At approximately eleven p. m. on June 21, 1945, a deputy sheriff of Spokane county was patrolling the Upriver drive, which parallels the Spokane river just east of the Spokane city limits. His attention was attracted to a car parked in a wooded area off the traveled portion of the highway at a distance of some fifty yards. He examined it and found that it contained a number of gunny sacks, some with chicken feathers in them, and thereupon determined to await the return of the owner. After an hour he left to obtain assistance, returning shortly with two deputy sheriffs. They determined that the car was licensed to the defendant, Fred Grenz, and that it had been under sur-veillance for some time as one suspected of being used in chicken-stealing operations.

The deputies watched this car until approximately 1:30 a. m., June 22nd, when the defendant came running toward it, got into it alone, and drove away without turning on his lights until he swung eastward into the Upriver drive. It was known to the officers that Grenz' home lay two miles north and four miles west of where his car had been parked. Defendant took a southerly and easterly course as follows: east, one-half mile on Upriver drive; south, two and one-half miles on Argonne road; south, one and one-half miles on the Chester-Mica highway. Upon reaching 16th avenue, defendant extinguished his lights and again turned east. The deputies, with their own lights off, had followed at a distance of from two blocks to one-half mile, keeping his tail light in view.

The officers halted at 16th avenue to debate their next move. Then they also turned east into 16th avenue and had traveled only two hundred fifty yards when they saw the defendant stooped over with one hand outstretched toward the wires of a fence which paralleled the south side of the avenue. The officers then flashed on their lights for the first time. In the resulting glare, the defendant was seen to run in a northerly direction away from the fence and toward his car, which was parked headed into the timber, in a cul-de-sac on the north side of the avenue.

The defendant stopped in the middle of the road in obedience to a command. The three officers then got out of their car and walked over to him. He was dressed in a pair of dark overalls, buttoned to the neck. Although the night was balmy, he was wearing dark gloves. His footwear consisted of a pair of rubber-soled shoes, commonly called "sneakers." In his left hand was an unlighted two-celled flashlight, and under his left arm were two gunny sacks. In his pocket were found a quantity of short pieces of heavy string and some clothes pins. When asked, "What are you doing here?", his only explanation of his presence was "What do think?" Having told the officers that he had come directly from his home, which they knew to be untrue, they took him into custody.

An examination of the terrain revealed to the officers that the defendant's car was thirty-three feet north of the road, headed into an impassable wooded area, and that the turtleback of the coupe was open. On the south side of the road was a small farm, which was bounded on the north by the aforementioned fence. At the point where defendant was surprised, the fence, although composed of hog wire below and two strands of barbed wire above, allowed ready access to the farm. The only buildings in the area were two chicken coops, the nearer of which was approximately fifteen feet south and one hundred thirty-two feet west of where defendant was discovered. The farmhouse was three hundred seventy-five feet west of that point. Over three hundred chickens had been stolen from this farm since January 1, 1945.

The defendant was charged with the crime of vagrancy under Rem. Rev. Stat., § 2688 [P.P.C. § 118-269] (8), which provides:

"Every— . . . (8) Person who wanders about the streets at late or unusual hours of the night without any visible or lawful business; . . . Is a vagrant, and shall be punished by imprisonment in the county jail for not more than six months, or by a fine of not more than five hundred dollars."

Trial was had before a jury in the superior court. The defendant took the stand on his own behalf and testified that he had parked his car near the Upriver road while attending a "weenie roast" down by the river; that after he departed from there, he was able, because of the bright moonlight, to see a car following him; that he was carrying over three thousand dollars in cash and consequently suspected that the occupants of the following car intended to rob him; that he drove out into the country to elude them; that, after turning down 16th avenue, he intended to double back towards town and turned into the cul-de-sac thinking it was the road back; that finding himself there, he determined to elude his followers by rubbing out the tracks which his car had made in the sandy road; and that he used the gunny sacks for this purpose and was so occupied when discovered by the officers.

The jury brought in a verdict of guilty. Upon being sentenced to six months in the county jail, the defendant has taken this appeal.

The appellant operated a chicken ranch of his own, which is of course a visible and lawful business. The appellant contends that the court erred in holding that it was not necessary for the state to prove that the appellant was without a lawful or visible business. Under the statute in question, it was necessary for the state to prove beyond a reasonable doubt that the appellant wandered about the streets at a late or unusual hour of the night without any visible or lawful business. The visible or lawful business that the appellant must have been proved to be without is that which is connected and concerned with his wandering

about the street at a late or unusual hour of the night and is not concerned with his mode of making a living.

A part of California's vagrancy statute is identical with Rem. Rev. Stat., § 2688 (8). In *Ex parte McLaughlin*, 16 Cal. App. 270, 116 Pac. 684, the phrase in question was construed. We quote with approval from that case:

"By subdivision 6 of section 647, Penal Code, one of the definitions of a vagrant is: 'Every person who wanders about the streets at late or unusual hours of the night without any visible or lawful business.' As we construe this subdivision, the words 'visible or lawful business' must be held as referring to the reason why such person is roaming the streets, rather than any business or avocation in life from which support is derived. In other words, the offense is complete under subdivision 6 if, without good or sufficient reason, one roams at late or unusual hours of the night, *and he is a vagrant without reference to his means of livelihood or vocation.*" (Italics ours.)

We are further persuaded to this construction by the fact that a study of our vagrancy statute, Rem. Rev. Stat., § 2688, reveals that the legislature, in enacting subd. (8), under which appellant was charged, was not there concerned with "means of support or livelihood," for subd. 13 deals with this very matter, providing:

"Every— . . . (13) Person having no visible means of support, who does not seek employment, nor work when employment is offered to him; . . . Is a vagrant, . . ."

Appellant's citations would be in point had the appellant been charged under Rem. Rev. Stat., § 2688 subd. (13), but they are not applicable where the appellant was charged under subd. (8). As was said in *State v. Harlowe,* 174 Wash. 227, 24 P. (2d) 601:

"At common law, vagrancy was defined as the wandering or going about from place to place by an idle person who has no lawful, visible means of support and who subsists on charity and does not work for a living, though able to do so. But both in England and in this country, *the common-law definition has become largely unimportant by reason of particular statutes on the subject.*

" 'It cannot be doubted that it is within the power of a legislature to define, subject to certain broad limitations,

who may be a vagrant and to prescribe punishment for those who shall come within the meaning of that definition.' 8 R. C. L., p. 340, § 370." (Italics ours.)

■ We think the evidence which showed that, at the time of the arrest, the appellant had a criminal intent, sustains the burden of proving that he was there without any visible or lawful business.

■ The appellant contends that the word "street" as used in the statute is not broad enough to apply to a roadway outside of the incorporated limits of cities or towns. We have held otherwise. In *Smith v. Drew*, 175 Wash. 11, 26 P. (2d) 1040, we said:

"The jury was privileged to find, under the evidence, that appellant was prowling about and creeping up on parked automobiles and their occupants, in the night time, under circumstances which indicated an intent to commit a crime, and that his business in the community was not a lawful one. This constituted vagrancy under the statute Rem. Rev. Stat., § 2688, subd. 8. It is true that the scene of the events was outside the limits of Seattle, and to that extent the instruction was not entirely correct. This was a mere inaccuracy, however, and unimportant in any event. *The act, if established, would constitute vagrancy, whether committed within or without the city limits.*" (Italics ours.)

■ The appellant contends that the court erred in refusing to hold that a single incident or act would not constitute vagrancy. In holding against appellant on this point, we refer again to *State v. Harlowe, supra,* wherein the appellant was charged with violation of Rem. Rev. Stat., § 2688 (7) which declares to be vagrants, "lewd, disorderly or dissolute persons." It was argued by the appellant in that case, "that the statute is not leveled against any *act* but merely against a *state of being.*" In the language of the court:

"It is no doubt true that, under the common law and under many provisions of various state statutes pertaining to vagrancy, a single act is not sufficient to constitute one a vagrant. On the *other hand, under other provisions of the same statutes, a single act is sufficient. Each case must therefore depend upon the particular provision of the statute.*" (Italics ours.)

■

The same rule is to be found in 66 C. J. 401, Vagrancy, § 4. A continuous or habitual wandering about the streets at late or unusual hours of the night is not required to constitute vagrancy as here charged. The obvious intent of the legislature in enacting subd. 8 of the vagrancy statute was to enable law enforcement officers to keep the streets clear, at late and unusual hours of the night, of those persons who, by reason of being bent upon serious mischief, theft, or burglary, have no visible or lawful business or mission in the locality.

Appellant contends that if he was guilty of anything, he was guilty only of harboring a criminal intent, and that "with mere guilty intention, divorced from an overt act or outward manifestation thereof, the law does not concern itself." *People v. Belcastro,* 356 Ill. 144, 190 N. E. 301, 92 A. L. R. 1223. Upon this theory, he has assigned as error the court's failure to dismiss the case at the close of plaintiff's evidence, submittal of the case to the jury, denial of defendant's motion in arrest of judgment, and the judgment itself.

It is true that there was insufficient evidence adduced to support a charge of attempted larceny or attempted burglary, for the reason that there was no overt act tending to accomplish the commission of either of these offenses. See Rem. Rev. Stat., § 2264 [P.P.C. § 112-21]; *State v. Cass,* 146 Wash. 585, 264 Pac. 7. But such was not the charge in this case. The laws relating to criminal attempts do not properly apply to the vagrancy statutes, of which it is said in 66 C. J. 399, Vagrancy, § 2:

"Such enactments, it has been said, are in fact rather of the nature of police regulations to prevent crime and public burdens and charges than of the nature of ordinary criminal, laws prohibiting and punishing an act or acts as a crime or crimes. And their purpose is to subject persons whose habits of life are such as to make them objectionable members of society, to police regulations promotive of the safety or good order of the community in which they are found."

The gist of the offense in the instant case is that the circumstances under which appellant was apprehended were

consistent with the hypothesis that he was about to commit a crime, and were inconsistent with any reasonable hypothesis that he had any lawful or visible business at the time and place of his apprehension. This is the very evil which the statute was designed to remedy, and it is difficult to conceive of a clearer case calling for its application.

■ Appellant attacks the constitutionality of the statute Rem. Rev. Stat., § 2688. We quote from *State v. Harlowe, supra:*

"Society recognizes that vagrancy is a parasitic disease which, if allowed to spread, will sap the life of that upon which it feeds. To prevent the spread of the disease, the carrier must be reached. In order to discourage and, if possible, to eradicate vagrancy, our legislature has enacted a statute defining vagrant persons and penalizing them according to its terms. Other legislatures have pursued the same course. We see no reason why this can not, or should not, be done as a valid exercise of the police power."

See, also, 66 C. J. 399, Vagrancy, § 3.

We find no merit in appellant's contention that he did not "wander about" because of his mode of travel or because he went in a direct line without hesitation for a distance of seven miles from beginning to end.

■■ The case was properly submitted to the jury. As was said by this court in *State v. Donckers,* 200 Wash. 45, 93 P. (2d) 355:

" 'The weight of the evidence, whether direct or circumstantial, is a matter for the jury. When the evidence is of the latter kind, it is for the jury to say whether it excludes every reasonable hypothesis consistent with the innocence of the accused.' . . . *Allen v. State,* 26 Ariz. 317, 323, 225 Pac. 332."

The judgment is affirmed.

STEINERT, JEFFERS, SCHWELLENBACH, and ABEL, JJ., concur.

MILLARD, C. J. (dissenting)—I cannot agree with the view of the majority that an enactment which defines a vagrant as one who wanders about the street at late or unusual hours of the night, unless such person is engaged in a visible or lawful business, is a valid exercise of the police power. In

the majority opinion, it is stated that it was necessary for the state to prove beyond a reasonable doubt that appellant wandered about the streets at a late or unusual hour of the night without any visible or lawful business; and that the visible or lawful business in question is that which is concerned with the wandering of the accused about the street at a late or unusual hour of the night and has nothing to do with the accused's mode of making a living.

Conceding, for the sake of argument, that such an enactment as interpreted by the majority is constitutional, the rule imposed upon the state of sustaining the burden of proof has not been met in the case at bar. It is true that the state may punish one for an attempt to commit a crime, but the state may not punish one because he made preparation to commit a crime, which is the most that may be said concerning the circumstances on which appellant's conviction is based. There can be no such thing as an attempt to attempt to commit a crime (*State v. Awde*, 154 Wash. 463, 282 Pac. 908) and the evidence in the case before us rises no higher than that.

That appellant was not engaged in any kind of business at the late hour when he was arrested, may be conceded. It may be admitted that the presence of the sack in his car and the place at which he was arrested indicated an intent or preparation to attempt to commit the crime of chicken stealing; however, there is no proof of any attempt to engage in an unlawful business. The fact that appellant made preparations to steal chickens and had intended to commit the crime if he had not been halted, does not prove that appellant was engaged or attempting to engage in an unlawful business.

The legislature has not the constitutional power to define as a crime the wandering about the streets at late or unusual hours of the night without being engaged in a visible or lawful business. Have we traveled so far along the highway of regimentation that an officious officer may accost a citizen at any time of the day or night and insist upon that citizen answering impertinent questions of the officer? Some are engaged in sedentary pursuits and others are so employed

that they suffer from insomnia. Some of those persons in wooing Morpheus may depart from their hotel or home at a late hour at night and walk or wander a few miles along the streets of our cities or counties. If such person wore an old sweater, old trousers or overalls, a slouch hat and heavy-soled slippers, would he, while so wandering, be engaged in any lawful business visible to the scalp-hunting officer of the law? The suspicions of the officer would not warrant his holding you or me, or any other citizen, so endeavoring by tiring himself to defeat insomnia.

Suppose some one of our prominent officials or business men, on his return at a late hour from a banquet to his home, decides to walk or wander a while to clear his head and remove the smell of smoke and other aroma from his garments ere he returns to the bosom of his family. Such person would be a vagrant under the statute as construed by the majority, as he would not be engaged in any visible or lawful business. The person described would be wandering about the streets at a late or unusual hour of the night. The fact that the official or business man was earning his living lawfully as an official of the state or business man, may not be considered.

Appellant operated a chicken farm, which was a visible and lawful business. The fact that he wore dark overalls, buttoned to the neck, and was wearing dark gloves and rubber-soled shoes might create the suspicion that appellant was preparing to attempt to commit a crime. It is not at all strange that he had short pieces of heavy string and some clothes pins in his pocket, and that he had a flashlight. Many automobilists carry strings, *drinking glasses,* paper, flashlights, and tools of different kinds. The fact that appellant was stooped over with one hand outstretched toward the fence which parallels the south side of the avenue, might also arouse suspicion. It is not at all astonishing that appellant fled when the officers flashed their lights on him, in view of the fact that he had a large amount of money on his person and suspected, as you or I would suspect, that the occupants of the car following him intended to deprive him of his money.

Appellant was where he had a perfect right to be. The legislature is without authority to require adults to remain at home after the hour of curfew fixed by the legislature. All that was proved in the case at bar is that appellant was traveling in an automobile at a late hour of night toward a farm in which was poultry in coops a short distance from the road where appellant was apprehended. He may have intended, and he may have prepared, to steal those chickens, but no attempt was proved. That he was not engaged in any business of any kind at the time of his arrest, may be admitted; but, as in the case of one of our officials or business men who courted sleep by walking or wandering up and down the streets of our city, such official or business man would not be engaged in visible business of any kind either. Would there be a presumption that he was engaged in an illicit affair or unlawful business? By what authority would the prowling officer halt and interrogate such official or business man?

The reason why I roam the streets at night, I do not have to divulge to any officer. If by my refusal to answer his impertinent questions I may be taken into custody and held incommunicado until morning, then we have returned to the evil days of the sixteenth, seventeenth, and eighteenth centuries in England. Then a man financially poor whose dress was not suitable for the drawing room could be arrested and subjected to indignities because walking or riding at a late hour of the night, while a citizen whose position in life differed financially and socially from the other could stagger along the streets at any time of night or day without fear of molestation by the minions of the law.

At the time America was colonized, two hundred different crimes were punishable by death under English law. In the reign of Queen Elizabeth from 1558 to 1603—she was of the House of Tudor—England had her national labor relation law and her office of price administration. Under the Tudors and the early Stuart kings, the legislation both as to prices one paid for food and clothing and wages payable to workmen was part of a scheme for the regulation of the poor, those who could not successfully combat the tyranny of

England. Wages were regulated by law and could not be affected by the agreement of the parties. A combination of workmen to raise wages so fixed was as definitely illegal as a combination of employers to raise prices above the level fixed by statute. An individual workman was not free to refuse work offered to him. The ideas underlying these laws were approved as late as the early part of the eighteenth century. The purpose of the laws was to coerce and compel the poor to work and to be employed at the low scale of wages fixed by those who profited from their labor. The Elizabethan poor law and other prior and subsequent related laws of England, which some contend were aimed to relieve the impotent and educate the children of those who could not maintain themselves, and to provide work for the able-bodied, are the forerunners of the vagrancy statutes of this country. In an endeavor to coerce acceptance of wages fixed by law and to compel others who refused to work at all to accept employment, England enacted statutes classifying such poor persons as vagrants and authorized, *merely on suspicion*, their arrest and commitment as vagrants.

The iniquitous statute under which appellant was convicted was born of those evil statutes of the vile Tudors and sinful Stuarts.

Organized effort commencing in the eighteenth century to ameliorate the conditions of the poor culminated two centuries later in organization of powerful trade unions through which the workers as a unit seek to help the individual workman.

The judgment should be reversed and the cause remanded with direction to dismiss the action.

SIMPSON, J. (concurring with MILLARD, C. J.)—I concur. The rule adopted by the majority places the burden of proof of innocence upon the accused.

ROBINSON, J. (dissenting)—I am not in accord with the majority opinion.

CONNELLY, J., dissents.

February 24, 1947. Petition for rehearing denied.