[Nos. 38295, 38296, 38665. Department One. October 27, 1966.]

THE STATE OF WASHINGTON, *Respondent,* v. STEPHEN D. COLLINS, *Appellant.*

STEPHEN D. COLLINS, *Petitioner,* v. ROGER MAXWELL, *as Superintendent of the State Reformatory, Respondent.*\*

*\*Reported in 419 P.2d 590.

*George N. Prince,* for appellant (Appointed counsel for appeal).

*Charles O. Carroll* and *Stephen R. Schaefer,* for respondent.

HALE, J.—By the time he was nineteen, Stephen Collins had been convicted of two felonies. In one case (King County No. 42254) a jury found him guilty of burglary in the second degree committed December 7 or 8, 1964; in the other (King County No. 42252) another jury judged him guilty of taking and riding in an automobile without the owner's permission, committed January 31, 1965. He now brings a consolidated appeal, combining his assignments of error to raise constitutional questions concerning his right to counsel, freedom from self incrimination, admissibility of confessions and admissions against interest, and delay in presenting him before a judicial officer.

Defendant Collins also filed an original petition for habeas corpus in the Supreme Court, but, because it raised the same issues on the same record as the consolidated appeal, he moved in open court to dismiss the petition. We grant the motion and order the petition for habeas corpus dismissed.

Turning now to the facts, we consider first the arrest in the burglary case. As King County Deputy Sheriff Andrews and his partner cruised the vicinity of South 129th and Empire Way, King County, in a sheriff's patrol car just past midnight, December 8, 1964, they saw two boys near the Jiffy Mart carrying several well-loaded shopping bags and packages. The officers stopped the car, got out and talked to the boys, who appeared to be quite young, asked

them their ages and what they were doing. The boys said that they were 15 and 16 years old, and that the bags and packages contained merchandise which they had been accumulating for a week or two in preparing for a party.

Assuming from their statements and appearance that the boys had stated their ages truthfully, the officers asked their home addresses and telephone numbers, informing them that they would request their parents to pick them up. Acting on the information given them, the officers soon learned that the telephone numbers and names were fictitious when they attempted to reach the boys' parents by telephone.

They then asked the defendant Collins where he lived, and he described a pink trailer in a court immediately in back of the Jiffy Mart. He said that any identifying papers he might have would be in the trailer, so the officers took the boys there only to find that the defendant had no key. At this time, defendant told the officers that his name was Stephen Collins and that he was 17 years old, and said again that he lived in the trailer but added that his parents were not then at home.

The officers then took the boys to the Renton police station where, on checking the juvenile files, they learned that the defendant was 18 instead of 17 years old, discovered his true address and took him to his home where Collins' father said that he would have him available for questioning later. They then drove the younger boy to his home where, on questioning him in his mother's presence, they were told that he and Stephen Collins had broken into and taken quantities of merchandise from the Jiffy Mart.

Excerpts from Officer Andrews' testimony describe subsequent events: "I went back to Steve's residence then and arrested Steve for Suspicion of Buglary." After mentioning that Collins' father had been present, the officer's testimony continued, "At that time I told him that he didn't have to say anything and that anything he might say could be used against him."

Neither Stephen nor his father at Stephen's home asked permission to call an attorney. The officers then took

Stephen into the patrol car, and en route to the county jail in response to Stephen's queries about his young friend, they told him that the boy had admitted burglarizing the Jiffy Mart and had implicated Stephen. Officer Andrews testified that Collins, without any threats, promises or coercion, on learning of his companion's statements, admitted the burglary. The officer testified:

> When we were coming to town Steve says, "Well," he says, "You might as well know the whole thing." And then he said, "I have been into the Jiffy Mart three times in the last four days." . . . He said that he had crawled through a ventilator hole in the back wall.

The hole in the back wall, it later developed, had been covered by a screen which the boys had removed.

The next day about 1 p.m. in the interrogation room at the county jail, another officer, Deputy Sheriff Forrester, interviewed Collins alone. Before putting any questions to Collins, the officer testified he cautioned Collins "That he did not have to tell me anything, that he had access to an attorney, that anything he said might be used against him in a court of law."

Officer Forrester said that he questioned Collins from 1 to about 1:50 p.m., and, from information freely and voluntarily supplied by Collins, began writing out a statement. He said he made no threats, promises or inducements, and continued:

> I started to take a written statement from him and he stated he would like to finish the statement himself, would like to write it himself.

The statement, about two thirds in the officer's handwriting and one third in Stephen's, was signed by Collins in the presence of Officer Forrester and a Sergeant Chase and was on this and other evidence admitted as defendant's confession. It contains a recital at the outset that

> I have been advised of my rights to an attorney before giving or signing this statement and I realize it may be used as evidence against me. I give this statement of my own free will without fear, force, threat, or promise of any favor.

Acknowledging criminal intent and culpability, it closed with the words "I wrote this of my own free will, knowone [*sic*] forced it out of me."

On this and other evidence of a similar nature, the learned trial judge, after a hearing conducted under Rule of Pleading, Practice and Procedure 101.20W, RCW vol. 0, in the jury's absence, ruled both the confession and statements of defendant in the patrol car admissible. Collins, at this hearing, testified that he knew of his right to counsel prior to making any statements or giving a confession, but paid no attention to it and that he had never consulted a lawyer and had been in police custody only once before as a juvenile and then without an attorney. He testified that he had spoken voluntarily to the officers; that no one had threatened him or forced him to sign the statement; that he had voluntarily written out part of it and signed the document, knowing that it could be used against him.

The young boy who had been with Stephen on the night of the burglary corroborated the confession, testifying in detail that it was Stephen's idea to break into the place. He described their entry and exit in detail.

The other conviction concerns the theft of and riding in an automobile. On the burglary charge just described, Collins had been taken to the jail early in the morning of December 8th, and signed the confession that afternoon. December 10th, the prosecuting attorney charged him in justice court with second-degree burglary and a warrant thereupon issued, fixing bail at $3,000. The next day, Friday, December 11th, defendant was taken before a justice of the peace, Seattle district court, where, with appointed counsel present, Collins pleaded not guilty. December 14th, the justice court released defendant on his personal recognizance.

His arrest on the second charge (No. 42252) occurred January 31, 1965, while he was at liberty on personal recognizance on the burglary charge. Officer Sorensen of the Seattle Police Department described the circumstances of this second arrest in his testimony:

We saw him in a car, a car that we chased, eventually

that dead-ended itself at 36th Southwest and Willow, in that vicinity. Two occupants in the car, the driver, got out the driver's side and took off, and my partner followed him, and the defendant got out also on the driver's side. He had been a passenger, and he got out of the car just as I got around to the front of our car. He came out of the car, turned around, and he had a screwdriver, I believe it is, in his right hand, and I pulled my gun out, and I ordered him to drop the screwdriver and told him he was under arrest, and he wouldn't drop it. He just stood there. He didn't say anything, he just stood there. I ordered him again to drop it. He refused. I ordered him then to get down on the ground, and after a few seconds' delay he did this, still holding the screwdriver in his right hand. So I walked up and kicked the screwdriver out of his hand and handcuffed him and placed him in the back of our car.

According to Officer Sorensen's further testimony, Collins, while en route to the police station at about 3 a.m. and without any force, threats or inducements, told the officer that he had been hitchhiking out to a friend's house; that the driver had given him a lift; that he did not know the car had been stolen. At the pretrial confession hearing, under RPPP 101.20W, Collins testified—as he expressed it— that Officer Sorensen had roughed him up, but the trial court found as a fact that Collins' statements to the officer had been voluntarily made and not induced by force, fear or promise.

Collins testified that it was about 6 a.m., Sunday, when they arrived at city jail; that he had no visitors there. The next day, Monday, February 1st, he was questioned for about 15 minutes concerning the theft of the car, talked to his attorney on the telephone, and then was taken to the county jail. His attorney told him, said Collins, that he would come down to the jail about noon, but failed to appear. After speaking with his attorney, Collins was questioned by officers at the county jail. He testified that the police officer had "told me that I had a right to an attorney before I gave him any statement at all or said anything," before he had spoken to his lawyer on the telephone.

At the county jail, defendant was again allowed to tele-

phone his home and he talked to his grandmother. His attorney, Collins said, failed to visit him in jail prior to February 9th, the day when he gave a written confession to Deputy Sheriff Forrester, the same officer who had interviewed him and obtained his confession on the burglary charge on December 9, 1964.

Defendant also testified that he had four or five contacts with the police prior to his arrest by Officer Sorensen, adding, "Well, when I had first been in trouble I was later told I was not supposed to say anything or do anything until I had an attorney." He said that he had signed a confession despite this knowledge and heedless of the advice given him several days earlier by his attorney to "Just don't say anything. I will be right down." He signed the confession, he said, because Deputy Forrester had told him it would be better to clear the thing up.

Deputy Sheriff Forrester testified that he interviewed defendant Collins on the second charge in the interrogation room of the sheriff's office February 9, 1965; that Collins was then in custody on a bench warrant issued on the earlier burglary charge; that before questioning Collins, he informed him "That he did not have to tell me anything. He had a right to a counsel." The officer knew that Collins had earlier talked to an attorney and said that the defendant did not request leave to call his attorney until after the interview. The confession thus obtained by Officer Forrester was admitted in evidence after preliminary confession procedure (RPPP 101.20W) and the admission that the two boys had stolen the car by pushing it to get it started was fully corroborated by the testimony of the younger boy at the trial.

This confession, too, as in the burglary confession, contained the statement just above defendant's signature that

I have read this statement that consists of two pages, and I find it to be true and correct to the best of my knowledge. I realize my right to an attorney before giving or signing this statement.

In each case following pretrial in the jury's absence, pursuant to RPPP 101.20W, the trial judge made elaborate

and detailed findings as to the undisputed facts, the disputed facts and the conclusions to be drawn therefrom. Both judges ruled that the oral admissions and written confessions to which exceptions had been taken were voluntarily made by defendant with knowledge of his right to remain silent, to decline to sign any incriminating papers whatever, and to consult with a lawyer.

All of the assignments of error combine to raise one point: Did anything occur, or fail to occur, concerning the arrest, interrogation, presentment to a judicial officer, or signing of a statement, which deprived the defendant's statements, oral and written, of their free and voluntary nature? If it did, then they were inadmissible. If not, they were properly received.[1]

We have recited sufficient facts, we believe, to show that

[1]Appellant refers to the Judges' Rules of England as prescribing the minimal standards for police conduct in taking confessions. We find them succinctly set forth in 1 Stone's Justices' Manual 373 (1964 ed.) under the heading "Statements by Persons Suspected of Crime or by Prisoners in Police Custody," a memorandum approved by Her Majesty's Judges of the Queen's Bench Division; 9 Halsbury's Laws of England (3d ed.) 422. In taking note of the Judges' Rules, one should not overlook that the legislation authorizing them, Supreme Court of Judicature (Consolidation) Act, 1925, 15 & 16 Geo. 5, § 99, emanates from a Parliament which possesses a supremacy in legislative matters unknown to our constitution. Rules thus promulgated have the special force of parliamentary enactments, for the statute authorizing them specifically provides, § 99 (5) "Rules of court made under this section shall be laid before Parliament . . . ." 11 Pub. Gen. Acts 1249. That English courts draw a distinction between enforcement of the rules for the public good and exclusion of the evidence obtained in violation thereof, may be observed in the statement from IV Stephen's Commentaries on the Laws of England, 1961 Supp., p. 159:

If the rules are offended it is a matter for the court's discretion whether the evidence so obtained should be admitted or not (*R.* v. *Straffen,* [1952] 2 Q.B. 911), and if it is admitted the jury must be given a clear direction to reject it unless they are satisfied that the prisoner gave it voluntarily (*R.* v. *Bass,* [1953] 1 Q.B. 680).

See *R.* v. *Mills*; *R.* v. *Lemon,* 2 [1946] All Eng. Rep. 776, where, in a robbery charge, the court of criminal appeal, after saying

It is to be observed that the Bristol police did not observe this rule which has been laid down for their guidance, and the sooner they study these rules and learn and abide by them, the better.

ruled that the offense against the rules did not render the confession inadmissible and proceeded to admit it.

the trial judges had before them at the procedural hearings under RPPP 101.20W, ample evidence to support their findings of fact. Next, it should be mentioned that abundant evidence presented at trial corroborated the confession and admissions and supported the verdict of guilty in each case.

In summary, we note that in the first case the officers took defendant to his home during the early morning hours of December 8, 1964, and left him with his father, then returned later to arrest him. Both he and his father had a good opportunity to consult with counsel during the officer's trip to the younger boy's home. Before receiving any statements from Collins, the officer advised him of his right to remain silent and told him that whatever he said could be used in evidence. Later in the afternoon of that day, after again being told that he need say nothing and that he could call an attorney, and without any force, violence, threats, or promise of reward, the defendant made a full confession in writing.

The next morning, December 10, 1964, he was taken before a justice of the peace presiding in Seattle district justice court and charged by complaint with burglary in the second degree and 4 days later released on personal recognizance.

His second arrest occurred January 31, 1965, while at liberty on personal recognizance, after pursuit by Seattle police officers and subsequent to the advice concerning his constitutional rights given him by the peace officers and justice of the peace in connection with his earlier arrest for burglary. Again, in his second interview with Officer Forrester prior to his signing a confession, he was explicitly advised of his right to remain silent and of his right to counsel and told that whatever he said could be used in evidence. On each arrest, he was allowed to and did call his attorney and communicated with members of his family.

He was held on the second arrest under the warrant for burglary second degree charged in the first arrest, for his personal recognizance was ipso facto revoked by the second arrest on probable cause, and we do not see where a delay in presenting him before a judicial officer until

February 16, 1965, on the second charge, *i.e.,* taking and riding in a motor vehicle without the owner's permission, affected in any way the voluntary nature of the admission earlier made or confessions signed. Already in custody on one lawful charge, we fail to see in this instance how the delay between arrest and presentment to a judicial officer prejudiced defendant or damaged his defense in any way in the second charge. Nothing transpired in the delayed hearing which would work a detriment to defendant for he was then in lawful custody and had full knowledge of his rights and immunities.

 Where the evidence does not show that a confession or incriminating admissions were induced by traumatic force or violence, or threat thereof, directed against the person of the accused or those genuinely dear to him, the ultimate test of admissibility remains that of voluntariness. *State v. Craig,* 67 Wn.2d 77, 406 P.2d 599 (1965); *State v. Streeter,* 67 Wn.2d 39, 406 P.2d 590 (1965); *State v. Gersvold,* 66 Wn.2d 900, 406 P.2d 318 (1965); *State v. Nesrallah,* 66 Wn. 248, 401 P.2d 968 (1965). If the defendant claims that his confession was induced by physical pain, force, violence, hunger, thirst, sleeplessness, or other forms of physical torture, or by threats and psychological trauma of such overwhelming power as to overcome his will, then, of course, the courts must examine these claims to ascertain their truth. Where the proof shows employment of such extremely coercive measures, the courts should take decisive action to reject the confession.

But additionally, the defendant at all times is armed with a quintuple safeguard to prevent the use of a forced or false confession. (1) If he knows that he need not make a statement at all, he is free to confess or not; the choice remains with him. (2) If he knows of his right to consult counsel before answering any question, he probably will not allow his will to be overcome. (3) If he is assured of his right to remain silent and that anything he says may be used in evidence and also of his right to consult with counsel, he knows too that he cannot be subject to physical force or fear of violence. (4) The trial judge passes upon the con-

fession and determines as a fact whether the confession was involuntary or freely and voluntarily given. (5) The defendant may present to the jury de novo all of the detailed facts connected with the giving of the confession upon which an assertion of involuntariness may be claimed to depend, and if the jury believes the confession to be involuntary, they may disregard it.

Defendant at all times following his arrest for the burglary, on December 10, 1964, knew that he had the right to counsel, the right to remain silent and that whatever he said might be used against him. He chose, nevertheless, to freely and voluntarily confess his guilt. His confessions and incriminating admissions were thus admissible.

Affirmed.

ROSELLINI, C. J., HILL and HUNTER, JJ., and WARD, J. Pro Tem., concur.