[No. 984-41615-1.　Division One—Panel 2.　July 19, 1971.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES LANNING, *Appellant.*

*Stephen E. Mansfield* and *William A. Stiles, Jr.,* for appellant (appointed counsel for appeal).

*Earl F. Angevine, Prosecuting Attorney,* and *Gilbert E. Mullen, Deputy,* for respondent.

SWANSON, J.—James Lanning was charged with the crime of murder in the first degree, in that he "did . . . with a premeditated design to affect the death of Mary Chapin . . . stab, cut, and wound . . . Mary Chapin, of which said mortal wounds . . . Mary Chapin . . . languished and died on November 19, 1969."

A Skagit County jury found Lanning guilty[1] as charged, and he appeals.

At approximately 7:20 p.m. on November 19, 1969, three hunters discovered the body of Mary Chapin lying beside a mountain road in a remote portion of Skagit County, Washington. A 1956 Chevrolet automobile registered in defendant Lanning's name was found abandoned in the middle of the road some 25 feet from the victim's body. Mrs. Chapin's 2½-year-old daughter was in the car, alive and unharmed. After issuance of an all points bulletin, and some 3 hours later, a state patrol officer observed the defendant walking

---

[1]The jury's verdict included a recommendation against imposition of the death penalty.

along Highway 9, about 5 miles from the scene of the crime. Soon after this disclosure was radioed into the sheriff's office, Lanning was apprehended by two deputy sheriffs and a Washington State Patrol trooper, near his home while still walking along Highway 9. Both Deputy Sheriffs Smith and Fagan testified at the pretrial hearing, and later before the jury, that after stopping the appellant and placing him under arrest he was immediately advised of his constitutional rights and given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). Thereafter, and during the same evening, the officers stated that the appellant received three additional declarations of his constitutional rights, and after each such recital made various exculpatory comments and explanations of his activities on November 19. In addition to the oral warnings, a written waiver form containing a recitation of his constitutional rights was explained to Lanning and signed by him at the county jail on the 19th. On the following day, November 20, and on November 25, the warnings were again recited, and additional accounts and explanations made. None of Lanning's statements, however, amounted to a confession. They were explanations of his conduct and activities on the day in question, and even though conflicting were designed or calculated to demonstrate his innocence. Nevertheless, the statements, whether intended to be exculpatory or in fact inculpatory because proven false, were custodial statements, and their admissibility is dependent upon their voluntariness. *State v. Woods*, 3 Wn. App. 691, 477 P.2d 182 (1970). The trial judge determined the statements to be admissible at a carefully conducted pretrial CrR 101.20W hearing,[2] and appellant's statements were introduced into evidence at the trial following.

---

[2]We note that the trial judge excluded all the witnesses at the pretrial hearing from the courtroom, except when testifying, with the exception of defendant's expert witness, Dr. Thompson, and admonished each witness after completion of his testimony to refrain from discussing the testimony given, or anything he observed at the hearing, with any other person likely to be called as a witness.

Appellant directs his first and principal assignment of error to the admission into evidence of these various statements he made to the sheriff's deputies. He argues this claim of error on two relatively narrow grounds: First, he attacks the finding reached by the trial court that he was properly informed of his constitutional rights as defined in *Miranda*, or, more specifically, he questions whether he was adequately informed of his right to a lawyer prior to any questioning, and that one would be appointed for him at public expense if he was unable to afford one, prior to answering any questions. Secondly, appellant asserts that the state failed to discharge the burden placed upon it by *Miranda* of showing that he knowingly and intelligently waived his privilege of immunity from self-incrimination.

The first ground of appellant's argument is directed to the sufficiency of the warnings given, not that warnings were not in fact given, nor that the exculpatory statements were not made. Such challenge flies directly in the face of the trial court's explicit finding entered following the CrR 101.20W hearing. We said, in *State v. Cashaw*, 4 Wn. App. 243, 480 P.2d 528 (1971), at 247:

> In determining whether any part of the Miranda rule has been complied with, we must look to the trial court's findings to determine what occurred.

In looking at the court's findings on this question we note this language:

> and that immediately upon his [Lanning's] being stopped and placed under arrest Deputy Smith advised the defendant accurately on his constitutional rights and administered the Miranda warnings; . . . *that he had the right to have an attorney with him at all times and at the time of making any such statement, and in the event that he did not have sufficient funds with which to hire an attorney one would be furnished to him before any statement was taken from him.*

(Italics ours.) Finding 3. In addition, the trial court's findings recite that Lanning was advised of his rights in substantially the same language, prior to any questioning, on each of the five subsequent occasions statements were

made. It should be noted that appellant argued to the trial court, and argues to us, that the written waiver form, exhibit 1, so marked in the CrR 101.20W hearing and marked exhibit 33 at the trial, which the appellant actually signed, was incomplete because it states in part:

> You have the right to talk to a lawyer for advise before we ask you any questions, and to have him with you during the questioning. You have this same right to the advise and presence of a lawyer, even if you cannot afford to hire one. We cannot ourselves furnish a lawyer, but one will be appointed for you, if you wish, when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.

The trial judge considered this to be an incomplete statement of the Miranda warnings but disposed of the question raised by pointing out in his oral opinion:

> but he had been previously advised three times before completely of his Miranda rights, of his constitutional rights.

The trial court then correctly concluded that any technical deficiency in the written waiver form did not vitiate and render worthless the prior warnings he found to be couched in direct and unequivocal language. Further, Chief Deputy Frazier testified at the pretrial CrR 101.20W hearing[3] that he supplemented the written statement by orally restating in full detail the Miranda rights.

---

[3]Deputy Frazier testified in part: "I went on to say I wanted him to understand he was in jail for murder and he was here because I felt he had murdered Mary Chapin and that this was about as deep trouble as he could ever be in . . . and he had a right to hire himself an attorney and talk to that attorney before answering any of my questions, and in fact have that attorney with him while I was questioning him and if he couldn't afford an attorney that the Court would give him an attorney free of charge and it wouldn't cost him anything and he could talk to that attorney and he could have that attorney with him during all the questioning, and I then asked him 'Do you understand those things?' Well, I said, 'Do you understand those things and do you understand how deep a trouble you are in?' He said he did. I

■ Because of the basic constitutional privilege involved, and pursuant to the mandate of *State v. Hoffman*, 64 Wn.2d 445, 392 P.2d 237 (1964), and subsequent cases, we have independently reviewed and carefully examined the record, as is our duty. Such review reveals that on all but one of the six separate occasions when the warnings were given,[4] the testimony of the officer's recital of constitutional rights was corroborated by at least one other officer.[5]

■ The court chose to disbelieve Lanning when he said he did not remember hearing any recital of constitutional rights, and, particularly, the right to an attorney. When the testimony of witnesses differs, as is the case here, the credibility question is a matter for the trial court's determination. As stated in *Cashaw*, 4 Wn. App. at 247:

No legislation requires that a trial court accept the testimony of a witness regardless of whether such testimony is believed. Accordingly, whether a defendant waives his constitutional rights must be determined on the basis of testimony accepted as correct by the trial court. [Citations omitted.]

Appellant argues that *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968); *State v. Tetzlaff*, 75 Wn.2d 649, 453 P.2d

said, 'Knowing how deep trouble you are in, do you still want to talk to me?' [H]e said, 'Yes', that he didn't know anything about the murder."

[4]The officers' repeated declarations of rights were superfluous, but harmless. *State v. Rowe*, 77 Wn.2d 955, 468 P.2d 1000 (1970), points out at page 959:

*Miranda* does not require the police to make repeated recitations of a defendant's constitutional rights before the taking of each subsequent statement. *State v. Blanchey*, 75 Wn.2d 926, 454 P.2d 841 (1969); . . .

[5]Deputy Sheriff Fagan corroborated Officer Smith's testimony at the pretrial hearing that he told Lanning, when seated in the state patrol car following his apprehension, that he had the right to have an attorney with him prior to questioning, by stating on cross-examination:

Yes, he said—I remember this was very emphatic, because just prior to this incident we had a case come up in court which was lost, and Deputy Smith, while in the back seat of the State Patrol car said, "You can have an attorney right here, right now, if you want it".

638 (1969); *In re Forest,* 76 Wn.2d 84, 455 P.2d 368 (1969); *State v. Creach,* 77 Wn.2d 194, 461 P.2d 329 (1969); and *State v. Erho,* 77 Wn.2d 553, 463 P.2d 779 (1970), are controlling and compel a reversal. Appellant's confidence in the five cases referred to is misplaced. In *Davis,* the court noted that even though an undersheriff was present during the time the police captain informed the defendant of his constitutional rights, the state failed to call the undersheriff as a witness to contradict the defendant's denial that his constitutional rights had been explained to him. The court made it clear in *Davis* that the state must bear the burden of establishing the circumstances under which the interrogation takes place. This is because the state has the only means of making available corroborated evidence of warnings given during interrogation. In the case at bar, however, all the officers present at the times appellant's rights were explained to him testified fully with no substantial conflict in their testimony. In neither *Tetzlaff, In re Forest,* nor *Creach* was the defendant specifically advised that he had the right to an attorney at the time of the interrogation, or prior to questioning. Such an incomplete explanation of his right to counsel was held to be inadequate. In *Erho,* the defendant was not advised that he had the right to an attorney in the event he could not afford one. This was a fatal omission in the advice required to be given. Here, the appellant was so advised. The trial court specifically found that the warnings given included the statement:

> that he [Lanning] had the right to have an attorney with him at all times and at the time of making any such statement, . . .

Finding 3. Our examination of the record contains abundant and convincing evidence of a clear and positive nature supporting the trial court's findings upholding the sufficiency of the warnings given.

The second ground of appellant's argument directed to the first assignment of error involves another aspect of the *Miranda* requirement of a "voluntary, knowing, and intel-

ligent" waiver. During the pretrial CrR 101.20W hearing, the appellant presented evidence that he had not completed the sixth grade, and had an IQ of 65 as determined by the Wechsler Adult Intelligence Scale which is within the mild mental retardation level. In the opinion of Dr. Thompson, a psychologist who examined Lanning for the purpose of testifying rather than treatment, appellant was unable to understand in any abstract way his constitutional rights. Because of his mental impairment, *i.e.*, low IQ, sixth grade education, and inability to understand constitutional rights in at least an abstract sense, appellant argues that he could not therefore understand the warnings given to him even if they were, in fact, fully and completely given. More specifically, it is appellant's contention that the court erred in concluding that he "knowingly and intelligently" waived his rights.

In addition to a voluntary waiver, *Miranda* requires a "knowing and intelligent" waiver. As we pointed out in *Cashaw*, 4 Wn. App. at 248, the meanings of these words overlap:

> the term *"voluntarily"* is used in the due process sense to assure the absence of physical or psychological compulsion. . . . the use of the word *"knowingly"* was intended to make clear the necessity for express Miranda warnings in every case of custodial interrogation as a condition precedent to the admissibility of answers obtained from such interrogation. . . . The court recognized that an accused might not by reason of physical or mental impairment understand the warnings. The word *"intelligently"* made it clear that such capacity to understand was a prerequisite to the existence of waiver.

(Italics ours.) The able trial judge carefully and at length analyzed the problem and stated in his oral opinion:

> I'm asked to rule as a matter of law that a person in this case, Mr. Lanning, of his mental condition, mental level, intelligence level I should say, under the stresses that he endured at the time the statement[s] were purportedly made, could not properly understand them and could not properly evaluate them in order to intelligently waive his rights as they were explained, and I think

following the theory in the *Alvis* case [*State v. Alvis,* 70 Wn.2d 969, 425 P.2d 924 (1967)] that this is a matter that might well go to the jury then that the statements are admitted but is not sufficient in and of itself to show that this man did not appreciate, did not understand the warnings or could not intelligently waive his rights.

The court also pointed out that Lanning did not say when he testified that he did not understand his rights but only that he did not get them until after he was questioned.[6] The trial judge then made this express finding:

> Upon the testimony of Dr. Thompson and upon hearing the testimony of Henry Lanning, defendant's father; Linda Wood, defendant's sister, and upon observing the defendant in Court and hearing him testify, the Court finds the above disputed fact [whether the defendant is mentally incapable of understanding the Miranda warnings and a statement of his constitutional rights in connection therewith, and lacks sufficient mental capacity to intelligently waive the same] to be false and does believe that the defendant is competent to understand a statement of his constitutional rights and possesses sufficient mental capacity to waive the same, and also finds that the presumption of capacity has not been overcome by any credible evidence to the contrary.

Finding 3.

■ We attach significant weight in any such determination to the finding of the trial judge who was in a better position than are we to determine the mental competency of the appellant. He heard him testify and was able to evaluate his ability to comprehend the meaning of questions asked and responses made. The trial judge observed the appellant and the understanding displayed by him of the court's explanation of his rights preliminary to the CrR 101.20W hearing. The court also noted the total absence of any specific testimony that appellant did not understand his rights as they were explained to him. Even though the appellant had only a fifth or sixth grade education and

---

[6]Appellant Lanning testified at the CrR 101.20W hearing that he could not recall any discussion of his constitutional rights by the sheriff's deputies until after he was taken to the jail and questioned. However, he did recall other events and details of the arrest.

scored 65 on the IQ test, which casts some doubt on his ability to understand an explanation of constitutional rights, his entire background provides ample evidence that he was capable of functioning normally in society, and of understanding and intelligently waiving his rights.[7] Lanning was 28 years of age, had previously been married, and was the father of one child. He was gainfully employed as a farmhand or milker, drove an automobile, and was able to handle his own affairs without assistance. It should also be noted that no assertion was made by appellant's father or sister in their testimony that the appellant had any difficulty understanding directions, explanations or ordinary conversation. When his father was asked about any difficulty the appellant had in school, he said,

Well, the principal always told me he was about two months behind all the other kids and so he let him go

---

[7] In *People v. Lux*, 34 App. Div. 2d 662, 310 N.Y.S.2d 416 (1970), the court held the fact that the defendant scored 77 on an IQ test and was within the dull normal or borderline range of intelligence, was not determinative of whether he was able to intelligently and knowingly waive his rights. The court thought it significant that the defendant had completed the eighth grade, served with honor in the armed forces, was gainfully employed as a janitor and serving as a volunteer fireman. Also, in *Commonwealth v. Darden*, 441 Pa. 41, 271 A.2d 257 (1970), the confession of a 15-year-old boy with an IQ of 76 and a mental age of 8½ to 11 years, given after 4 hours of police custody and 2½ hours of questioning, was held inadmissible by the trial court, but reversed on appeal. The appellate court placed considerable reliance on the testimony of police officers who noted nothing about the defendant's appearance or condition which would indicate any inability to understand the explanation of his constitutional rights.

For cases wherein mental deficiency was a major reason for the court's reversing the admission of a confession, see *Fikes v. Alabama*, 352 U.S. 191, 1 L. Ed. 2d 246, 77 S. Ct. 281 (1957), in which a confession followed a pre-*Miranda* interrogation of a person of low mentality, if not mentally ill; *Gallegos v. Colorado*, 370 U.S. 49, 8 L. Ed. 2d 325, 82 S. Ct. 1209 (1962), wherein the confession of a 14-year-old boy was made after 5 days of detention without seeing a lawyer, parent, or friendly adult; *People v. Drake*, 15 N.Y.2d 626, 255 N.Y.S.2d 671, 203 N.E.2d 922 (1964), which was remitted to the trial court for a hearing as to whether the petitioner was incompetent when he waived his right to counsel; and *People v. Pounds*, 64 Misc. 2d 634, 315 N.Y.S.2d 672 (Sup. Ct. 1970), in which the admissions of a 17-year-old boy of dull normal intellect with a third grade reading level were held not to meet the constitutional requirements.

along with them to keep from pulling him back down in the lower grades.

A plethora of authority supports the rule that

[m]oderate retardation and a low intelligence quotient do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession.

*State v. Edwards,* 257 La. 707, 243 So. 2d 806 (1971). *See Brown v. State,* 245 So. 2d 68 (Fla. 1971). *See also Tucker v. State,* 482 P.2d 939 (Okla. Crim. 1971); *State v. Harden,* 206 Kan. 365, 480 P.2d 53 (1971); *State v. Barnes,* 245 So. 2d 108 (Fla. 1971); *People v. Lara,* 67 Cal. 2d 365, 432 P.2d 202, 62 Cal. Rptr. 586 (1967). When all the factors bearing upon the appellant's ability to understand are considered, in the absence of any evidence of trickery, cajolery, threats, promises, or intimidating procedures, we cannot say that the trial court's finding of intelligent and knowing waiver is not supported by ample testimony, and the heavy burden of proof required by *Miranda* satisfied.[8]

■ Appellant's second assignment of error contends that the evidence was insufficient to show that appellant committed the crime charged, so that appellant's motion for judgment n.o.v. ought to have been granted. It is true, as appellant argues, the evidence presented by the state was entirely circumstantial, and there was no direct evidence placing the appellant at the exact scene of the crime. In this connection, the rule is well stated in *State v. Green,* 2 Wn. App. 57, 70, 466 P.2d 193 (1970):

Although the circumstantial evidence in the case must be consistent with the hypothesis that the accused is guilty, and inconsistent with any reasonable hypothesis

---

[8]In *State v. Allen,* 67 Wn.2d 238, 406 P.2d 950 (1965), the competency to "confess" is equated with the competency to "testify." If a person has been adjudicated insane, a rebuttable presumption arises that he is incompetent to testify. Where there has been no adjudication, the burden of showing incompetency is upon him who objects on that ground. See *State v. Alvis,* 70 Wn.2d 969, 425 P.2d 924 (1967).

or theory of his innocence (*State v. White*, 74 Wn.2d 386, 444 P.2d 661 (1968)), whether or not the circumstantial evidence excludes every reasonable hypothesis consistent with the appellant's innocence is a determination properly made by the trier of the facts. *State v. Grenz*, 26 Wn.2d 764, 175 P.2d 633 (1946), *appeal dismissed*, 332 U.S. 748, 92 L. Ed. 336, 68 S. Ct. 54 (1947); *State v. Donckers*, 200 Wash. 45, 93 P.2d 355 (1939). This court's only function on appeal is to determine if there is substantial evidence in the record tending to establish circumstances upon which a finding of guilt can be predicated. [Citation omitted.]

Without recounting all the facts, there is sufficient evidence in the record to establish circumstances upon which a finding of guilt can be predicated. It was shown that on the evening prior to her death Mary Chapin left Lanning asleep in the front room of her home when she went out with another man with whom she had intimate relations. On the following morning, the day of Mrs. Chapin's death, the appellant drove his car into the driveway of the Chapin home just as Mrs. Chapin and her paramour were returning from their rendezvous. The record further reveals that the appellant was well acquainted with the deceased and regarded her as his fiancee. When last seen alive, at about 4 p.m.,[9] Mary Chapin was riding with Lanning in his car in the Clear Lake area, some 5 or 6 miles from the place where her body was found. His car was found within 25 feet of the victim's body. Her throat had been severely lacerated, and according to the medical examiner she bled to death. Even though some 3½ hours had elapsed since the approximate time of Mrs. Chapin's death, appellant was apprehended with twigs and other debris in his hair, clothing and boots, and his appearance was consistent with that of someone who had been traveling on foot across country. Human blood stains were found on his clothing. He gave conflicting explanations of his activities which were rebutted by the state and shown to be false.

Appellant's third assignment of error contends

---

[9]Medical experts fixed the time of death at approximately 7:20 p.m.

there was insufficient evidence to convict of first-degree murder because there was no proof of premeditation. Appellant argues that he could be guilty of second-degree murder only. This contention is not well taken. The court properly instructed the jury on the law regarding premeditation, to which no exception was taken. Instruction 12 states:

Premeditation means thought over beforehand and describes the mental operation of thinking upon an act before doing it. Premeditation necessarily implies that some time exist between the thought process and commission of the act itself. By this is meant that premeditation cannot occur simultaneously with the act but must precede the act. The time involved must be sufficient to allow the defendant to think over the act beforehand, but may involve no more than a moment in point of time.

The law of the case is then as stated in instruction 12. The state produced evidence that the victim's body was located some 25 feet from the appellant's vehicle which was facing downhill on a lonely logging road on Cultis Mountain. There was no evidence of a struggle of any kind. The victim bore no evidence of physical abuse other than the lacerations about her neck. The pathologist who examined the body testified regarding the cause of death:

She died of exsanguination, which means she bled to death through the laceration of those two large vessels which I described, the right carotid, and the left common carotid. She also bled to a lesser degree from the jugular vein and the evidence of the jugular vein that was severed was due to the fact as shown in the autopsy, we found here in the right side of the heart, and the reason for this was *the neck structure having been severed* and the two vessels I mentioned having been severed, . . .

(Italics ours.) The doctor further testified,

I would say death would have occurred within a matter of two to three minutes.

This is sufficient evidence upon which the jury could determine that appellant formulated an intent to kill the victim while driving up the lonely logging road, or at some point

between the parked car and the spot approximately 25 feet away where the murder occurred. Further, the jury could infer from the description of the scene, the extent of the wounds, and all of the circumstantial evidence that the appellant had to use some sharp instrument, such as a knife, to inflict the severe wounds that were suffered by the victim. Some premeditation was necessarily involved in order to have available a knife-edged, lethal instrument capable of nearly severing the victim's neck.

The premeditation required in order to support a conviction of the crime of first-degree murder may involve no more than a moment in point of time.

*State v. Temple,* 5 Wn. App. 1, 8, 485 P.2d 93 (1971). *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962).

▇ Finally, appellant claims he should have been permitted to present to the jury the issue of whether or not he knowingly and intelligently waived his constitutional right against self-incrimination and his right to have the assistance of counsel prior to any questioning. In effect, appellant seeks to resubmit the question determined by the court in the CrR 101.20W hearing regarding the admissibility of the statements made by him to the sheriff's deputies. Such is not the law in the state of Washington. Whether the appellant was properly advised of his constitutional rights and whether or not a knowing waiver was given pursuant to the applicable rules is a question of law to be determined by the court. Of course, all of the circumstances surrounding the giving of the statements, and all other matters of evidence that bear upon the voluntariness of the statements, may be presented to the jury. This was done. The question raised by appellant was resolved in *State v. Aiken,* 72 Wn.2d 306, 434 P.2d 10 (1967), when the court stated at page 344:

We therefore hold that the evidentiary hearing before the trial judge alone on the issue of voluntariness of Aiken's confessions was sufficient to meet the *minimum* requirements of due process under the federal constitutional standards.

However, under our state procedure, [CrR] 101.20W, *supra, State v. Collins, supra,* [69 Wn.2d 627, 419 P.2d 590 (1966)] if the trial court has found the confession to be voluntary as a matter of law, and admissibility is not precluded by an exclusionary rule affecting the defendant's procedural safeguards, [citations omitted], the jury may redetermine the question of voluntariness as a matter of fact, as it relates to the weight and credibility to be given the confession. The jury may not, however, disregard a confession by measuring it against the foregoing legal tests of due process and reject the confession, as a judge would, if the tests are not fulfilled.

In the case at bar, the jury heard the testimony of Dr. Thompson regarding appellant's mental capacity, and the trial judge instructed the jury:

You may take into consideration the mental capacity of the Defendant at such time he made any statements when in custody and that such mental capacity must be considered in determining the character of the statements and whether such statements were voluntary or involuntary and also in determining the weight, credibility and effect to be given the statements, and for no other purpose.

Instruction 15.

We find no error in the record and affirm the judgment and sentence.

FARRIS, A.C.J., and JAMES, J., concur.

Petition for rehearing denied October 20, 1971.

Review denied by Supreme Court December 13, 1971.