[No. 97-40954-3. Division Three. March 10, 1970.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN GREEN, *Appellant.*

*Thomas B. Grahn,* for appellant (appointed counsel for appeal).

*Lincoln E. Shropshire, Prosecuting Attorney,* and *Charles Flower, Deputy,* for respondent.

EVANS, C. J.—Defendant John Green appeals from a conviction of manslaughter, urging as his sole ground for reversal that the evidence which is entirely circumstantial is insufficient to sustain the conviction.

The amended information charged Green with the killing of a 2-year-old Negro child, Maxine Frances Morrison, nicknamed Mackie. The charge was alternative, the first ground being essentially an assault leading to death, the second being a culpable failure to provide medical attention for the assaulted child.

The trial was to the court, defendant having waived his right to a jury. At the conclusion of the state's evidence the defendant moved to dismiss for failure to prove a prima facie case, and the trial judge, after weighing the evidence then before him, denied the motion. The defense then presented its case, including the testimony of the defendant. At the conclusion of all evidence the trial court dismissed the second alternative charge (failure to provide medical attention) and after a carefully detailed analysis of the evidence concluded defendant was guilty of inflicting the blow which led to the child's death. The usual posttrial motions were made, argued and denied; findings of fact and conclusions of law, together with judgment and sentence, were entered on March 21, 1969. Defendant was sentenced to imprisonment in a penal institution for a period of not more than 20 years.

The evidence establishes that sometime during the night of September 23, 1968, or the morning of September 24, Maxine Frances Morrison died. Her death was caused by severe internal injuries consisting primarily of a lacerated liver, a torn mesentery, and a transected pancreas, which resulted in massive internal hemorrhaging.

Maxine was the child of Paulette Morrison, age 19 at the time of trial. Although the defendant John Green and Paulette had been living together for almost 2 years, he was

neither married to Miss Morrison nor the father of her child. They met in Seattle in 1966, where they lived until April 1968. Defendant, a high school graduate, 22 years old at the time of trial, had been unemployed for a considerable period of time prior to September 23. The "family", consisting of John Green, Paulette Morrison, and the child, who will be referred to as "Mackie", lived primarily on Paulette's earnings as a prostitute.

About Easter of 1968, Paulette, the defendant, and Mackie moved to Yakima. After a short stay with defendant's mother they moved into a small house.

Paulette continued the practice of prostitution, which necessarily took her out of the house several nights a week. The usual arrangement was that if Mackie was awake when Paulette went out, defendant would stay with the child until she was asleep. Quite often he would then leave the house to "shoot pool, watch card games and things." Defendant usually locked the house when he left, the key being kept under one of the eaves in case Paulette came back to the house with a "customer." It was their practice when both Paulette and defendant were away from the house that one or the other of them would check on Mackie about every 3 hours. During the week prior to September 23 Mackie had been ill with what Paulette and the defendant believed to be the flu. The daylight hours of Monday, September 23, were spent with Paulette and Mackie staying in bed watching TV while defendant was out of the house part of the time. About 7 or 7:30 that night, Paulette left the house, leaving the child in the care of defendant. Defendant testified he fed and bathed the child and put her to bed in the large bed shared by all three of them, then read the paper and watched TV until she was asleep. Paulette returned to the house around 10 or 10:30 p.m. with a "customer", which necessitated the defendant moving himself and the sleeping child to the back bedroom. Paulette and her customer then engaged in an act of prostitution and left the house. Defendant testified that he then returned Mackie to the bed and noted she was still sleeping

and alive. During trial, defendant testified that after he put Mackie to bed he left the house, locked the door, put the key under the eaves of the house and went downtown for about 3 hours, returning home about 1:30 or 1:45 a.m. He also testified that upon his return the door was not locked. However, this testimony was in conflict with prior statements he made to both Paulette and the police on September 24, namely, that he was away from the house only a few minutes and that when he returned to the house the door was locked. The evidence further establishes that Paulette returned to the house about 1:45 or 2 a.m., at which time Mackie was in bed and appeared to be asleep. She and the defendant went to bed (the same bed with the child), staying awake and conversing until about 5 a.m.

Neither defendant nor Paulette recall either looking at or touching the child at any time prior to about 9 a.m. on the morning of September 24, when Paulette discovered Mackie was dead. Paulette became hysterical and her immediate reaction was to call the police, which the defendant vetoed. On this point Paulette testified, ". . . and he was saying, . . ., 'I don't know what happened to Mackie,' and so I kept saying, 'Call the police, call the police,' and he said, 'No', he said, 'We'll go over to Mom's and she will call the coroner.' " Defendant also appeared to be hysterical at this time. They both then ran over to defendant's mother's house, less than a block away, and Paulette told defendant's mother, "My baby is dead." Defendant's mother went to the house to investigate, confirmed the child was dead, and called a funeral home. In due course the coroner and the Yakima Police Department were notified. An autopsy was ordered and performed the same day. The coroner's autopsy disclosed the child died from the severe internal injuries mentioned above which, in his opinion, were the result of a forceful, single, blunt impact to the abdominal area of the child. The autopsy also revealed contusions on both sides of the face and the left side of the forehead, and multiple bruises of the abdomen, lower back and buttocks. None of these bruises and contusions,

however, was in any way causative of the child's death. The child was not sexually assaulted, nor were any broken bones found.

The doctor who performed the autopsy could not fix the time of death. The most precise he could be was that death probably occurred between the hours of 6 p.m. September 23 and as late as 10 a.m. on September 24. The trial court found that the direct testimony placed the time of death of the child between 9 p.m. on September 23 and 9 a.m. on September 24. However, from other findings made by the trial court it appears clear that in the court's opinion the most likely time for the fatal blow to have been struck was after 9 p.m. September 23 and before 1:45-2 a.m. the next morning, when Paulette returned to the house.

In evaluating the evidence at the close of the case the trial court first considered the evidence relating to the cause of death and concluded that the traumatic impact to the child was non-accidental and was the result of a deliberate assault. The evidence which the trial court found supported this conclusion can best be set forth in the trial court's own findings of fact, as follows:

### 12.

That the examination of the child revealed bruises on both sides of the body, bruises on both sides of the face and on the left side of the forehead, and multiple bruises of the abdomen, lower back and the buttocks. That the autopsy revealed internal injuries including a lacerated liver, a lacerated and completely transected pancreas, a lacerated mesentery, and cerebral edema. That the cause of the death of the child was a blunt impact to the abdomen which lacerated the liver, and lacerated and transected the pancreas. That none of the other injuries or bruises on the child was in any [sic] causative of her death. That the impact to the abdomen was a blunt, localized blow, the result of which would have been to put the child in immediate shock, followed by unconsciousness within a matter of minutes, at the very latest within ten minutes.

### 13.

That the prior injuries to the child, including a fall

from a small tree, the hitting of the child with sticks wielded by other children, the fall of the child from the bed onto a bedrail, the falling of an electric fan onto the child, and the fall of the child in the bathtub on September 23, 1968, were not in any way causative of the death of the child, all of such events either occurring at a time medically too remote from her death and/or involving a linear rather than a localized impact.

### 14.

That the child's death occurred within hours of the traumatic impact to her abdomen. While there is a possibility the child could have fallen on some protruding object and produced the subject type of trauma, such possibility is very unlikely and purely conjectural in view of the fact that shock would have immediately ensued, followed by unconsciousness within a matter of minutes, and no later than ten minutes. The court finds that the child would have been unable to exercise sufficient judgment to have so fallen and then returned to the bed. The court, accordingly, further finds, and is convinced beyond a reasonable doubt that the traumatic impact to the abdomen of the child was neither self-inflicted nor the result of an accidental fall.

### 15.

The court further finds that the traumatic blow to the abdomen of the child could not have been caused by the pressure of another human being lying on top of the child, nor by a blow struck by an adult human thrashing in the bed with the child. While an adult in bed with the child could have inflicted a blow sufficient to cause the subject trauma, such a blow would not have been either accident or inadvertent. The court, therefore, finds and is convinced beyond a reasonable doubt that the traumatic impact to the child was non-accidental and was the result of a deliberate assault.

The above findings are amply supported by the evidence and are sufficient to establish in the mind of the trial judge the belief, beyond a reasonable doubt, that the traumatic blow to the child was non-accidental and was the result of a deliberate assault.

The trial court then considered the evidence as it related to the possibility (a) that the blow could have been struck

by the mother, Paulette Morrison, or (b) by some unidentified third party. With reference to the possibility that the mother of Mackie might have struck the fatal blow the trial court made the following finding:

18.

That based upon her demeanor, her candor, and the court's observation while she was testifying at length during the trial of this matter, the court finds that the mother of the child, Paulette Morrison, loved the child, and that there is not the slightest possibility that she would have intentionally inflicted the injury from which the child died. That the court is convinced of the innocence of Paulette Morrison beyond a reasonable doubt.

As to the weight which the trial court gave to the testimony of Paulette, the court in its memorandum opinion, stated:

The Court saw her [Paulette] on the stand not just for a few moments but it must have been a matter of two hours at least. It saw her react and it saw a very pitiful, sordid person on the stand, and yet a person the Court is convinced loves that youngster. I do not believe that there is the slightest possibility she would have inflicted this damage upon this youngster. I believe that she still in her somewhat sordid, it could be frustrated way, still loves the defendant enough to protect him to some degree. That she hated to testify here. That she has done so only out of a feeling that she must testify. I do not believe that she would have stretched anything in favor of the State. She has indicated a great deal of faith in the defendant. She has not indicated any animosity. The Court cannot see in her testimony the slightest bit of hedging, the slightest bit of coloration toward the State. It seemed to the Court that she simply told it as she remembered it and did her very best. Now, it is true that she told a different story in some respects originally to the police about her prostitution. This is understandable. It is certainly not something that they tend to admit right away. But on the basic points here involved, the Court is convinced that she told the truth, that she told it as it happened, as best she can recall; and that if she gave any breaks in her testimony, she gave them to the defendant.

A careful review and analysis of the testimony of Pau-

lette Morrison leads this court to the same conclusion. However, the trial court had the added advantage of observing the attitude and demeanor of the mother during the course of the trial and during her testimony, and its evaluation of her testimony should and does have more validity and carry greater weight than any evaluation made by this court. The trial court was convinced of the innocence of Paulette Morrison beyond a reasonable doubt. There is substantial evidence to support this conclusion, and it will not be disturbed on appeal.

The question whether the blow could have been struck by some unidentified third party became a possibility which had to be considered when the defendant testified he was away from the house during the evening for a period of 3 hours. As to this third party possibility the court made the following findings:

17.

That the circumstantial evidence includes the possibilities that the blow could have been struck by the mother, Paulette Morrison, by the defendant, John Green, or by some unidentified third party. That the only evidence bearing on the "third party possibility" includes the following facts:

A. That several "customers" of Paulette Morrison knew the whereabouts of the doorkey which was kept under the eaves at the home in question.

B. That several customers of Paulette Morrison on different occasions had been in the subject home.

C. That Paulette Morrison had, on occasion, been threatened by third parties.

D. That on the weekend preceding September 23-24, 1968, Paulette Morrison, and another prostitute had robbed a customer who at the time was in the home in question engaging in an act of prostitution.

E. That the defendant, John Green, testified that when he left the home on the night of September 23, 1968, he locked the door but he gave differing versions of whether the door was locked or unlocked upon his return to the home.

F. That there is no history of any prior occurrence of

anyone ever having attempted forcible entry into the home.

G. That the only precaution taken for the child's safety when no adult was present was to check on the child approximately every three hours.

H. That such precaution was considered adequate by the defendant, John Green, although the mother, Paulette Morrison, occasionally had voiced some concern and had objected to the defendant leaving the child for any length of time.

That the court finds that the precaution taken indicates that neither the mother, Paulette Morrison, nor the defendant, John Green, had any substantial fear that anyone would break into the home and/or injure the child, and that the possibility of such having happened on the night in question is purely conjectural and does not give rise to a reasonable doubt.

Again, we must rely upon the well-recognized rule that the trial judge was in a better position than the appellate court to evaluate the testimony of the witnesses. It is obvious from the above findings made by the trial court that he carefully evaluated the evidence relating to this third party possibility. After doing so he rejected it as pure conjecture and, under the circumstances, not of such a nature as to give rise to a reasonable doubt. This finding also will not be disturbed on appeal.

Having thus eliminated, beyond a reasonable doubt, the third-party-intruder possibility, and the possibility that the mother, Paulette Morrison, struck the fatal blow, the trial court then considered the circumstantial evidence as it applied to the defendant, John Green, and made the following findings of fact:

21.

That the court is convinced beyond a reasonable doubt that the defendant, John Green, on the night of September 23, 1968, or the morning of September 24, 1968, did intentionally inflict the blow to the abdomen of the child, Maxine Frances Morrison, which resulted in her death. That this finding is based in part on the court's conclusion that all other reasonable possibilities have been

eliminated, and in further part upon the inconsistencies in the differing version of events as given by the defendant prior to the trial and as testified to during trial, the improbability of some of those versions and the impossibility of checking or rebutting the same, and in light of said inconsistencies the failure to back up the same with available proof, all of which are indicatory of the guilt of the defendant.

The basis for this finding is best understood by the following comments made by the trial court in its memorandum opinion rendered at the close of all of the testimony:

The testimony also seems to indicate that up until about 11, some time between 10 and 11, according to the defendant's testimony, the child was all right. Then the testimony breaks down into various versions of what occurred. And here the Court, of course, is confronted with a problem as to which version is the correct version. For instance, we are confronted with two different versions of whether when the defendant returned from a trip away from the house the door was locked or unlocked. He, at the police station, indicated that it was locked. He said he wanted to protect Paulette at that time and that was why he misinformed the police. He said that he misinformed them, that he did not merely misspeak. He now says it is locked, that it was locked at the time he returned. The possibility is laid open that the house could have been entered in any event because of the fact that the key was known to be in a given place because it was hidden in the eaves by the parties so that the others could get into the house, and this would be known to various customers.

The time that the defendant was gone has three versions now before the Court. One given the morning of the discovery of the child's death, he was gone about five minutes, that he wasn't gone more than five minutes. He told Miss Morrison that. Another version is that he went downtown to see an undisclosed person named George on business not disclosed. Now, this indefiniteness as to the nature of the business, indefinite as to the nature of the identity of the individual, the impossibility of checking on such a story is what leads the Court to believe that *State vs. Douglas* and *State vs. Portee,* that is the giving of an explanation that could not be checked, has some relevancy in this Court, in this case. He has said that he

visited Harlene Cain and that he was gone for something like three hours on the one version. He indicated that he was there a few minutes on the other version. He was there for a substantial period of time, over an hour and a half at the Cain residence. Harlene Cain was not produced. As I understood from the testimony, the Court understood others were there; none were produced in evidence. The defense has been a very complete, a very thorough, a very competent one. If there was any support for this visit, the Court is inclined to feel that evidence would have been produced to substantiate this otherwise unsubstantiated story.

The defendant has indicated that he was very upset. His mother indicated that he was very upset that morning. Mr. Keeler indicated that he talked to him. He doesn't recall the subject matter of that, and that the defendant seemed quite natural. He did not detail just what he had to say about that, or what he had meant by that; but certainly he did not indicate that the defendant was hysterical.

There is an indication that the defendant used narcotics. The Court does not feel that there is anything of a substantial nature proving that he was under the influence of narcotics that night. But he has indicated that he had used it in the past. There is some hint that he may have been a steady user of narcotics and certainly there is strong evidence, and the Court believes he had taken narcotics on the day of the 24th. There is very convincing evidence from the officers that he had done that but the evidence does not indicate that he took it the night before when the critical incidents happened.

Now, this matter of the inconsistencies in the defendant's stories has bothered the Court. Certainly the defendant could have left for a period of three hours, he could have left for the hour and a half or thereabouts that he originally told the police about and he could have simply left for five minutes or less as he originally said. The Court has considered this. The Court feels that this is the type of evidence that is indicatory of guilt, that is the inconsistencies in the stories, the inconsistencies when related to the developments that occurred between the stories. The improbability of stories, the failure to backup the stories with available proof, are things that cause the Court to very much doubt the defendant's version of what happened that night.

■ As will be noted from the trial court's memorandum opinion, above quoted, the process of reasoning used by the trial court was adopted from the rulings of our Supreme Court in *State v. Portee,* 25 Wn.2d 246, 170 P.2d 326 (1946), and *State v. Douglas,* 71 Wn.2d 303, 428 P.2d 535 (1967). The defendants in these cases were charged with possession of stolen property. The rule as stated in *State v. Douglas, supra,* and *State v. Portee, supra,* is that possession of recently stolen property in connection with "slight corroborative evidence of other inculpatory circumstances tending to show guilt," is sufficient to convict. The other corroborative evidence can consist of a failure to explain, a false or improbable explanation, or an explanation that cannot be checked or rebutted. Counsel for defendant, however, argues that stolen property cases are distinguishable from the present one in that in those cases at least the direct evidence of possession tends initially to link the accused to the crime. He contends that in the instant case there is no such direct evidence of any nature. With this contention we cannot agree. There is direct, undisputed evidence that at 7:30 p.m. September 23, when Paulette left the house, Mackie was alive, well, and in the exclusive care of the defendant. There is no evidence except the defendant's testimony that he thereafter, at about 11 p.m., left the house and was gone for a period of approximately 3 hours. When he so testified he created the third-party-intruder possibility and, under these circumstances, a "failure to explain" his absence, a "false or improbable explanation", or an "explanation that cannot be checked or rebutted", are indicatory of guilt.

There is other evidence of the type that is indicatory of guilt, although the trial court made no specific findings as such. On the night of September 23, defendant noticeably deviated from two customary household routines. Defendant routinely left the light on in the bedroom for Paulette Morrison. Paulette testified, and the trial court indicates by its findings it believed her, that on the night of September 23 the bedroom light was off and defendant would not

allow her to even leave the bathroom light shining through the partially opened door. In addition, Mackie routinely slept between Paulette and the defendant; on the night of Mackie's death defendant placed himself between Mackie and her mother, and these relative positions did not change all night, contrary to the defendant's account. Upon discovery of Mackie's death defendant effectively vetoed Paulette's request that he call the police.

 Defendant also contends it was error for the trial court to consider as indicatory of guilt the failure of defendant to support his story with available proof. The trial court had specific reference to defendant's failure to call Harlene Cain, whom he testified he visited during the 3-hour period he was away from the house. Miss Cain's name was included on the state's list of witnesses, and the record reflects she was present at court during 4 days of trial. It is defendant's contention that, under these circumstances, the burden was upon the prosecution to disprove defendant's testimony by any and all means, and if any inference is to be permitted because Harlene Cain was not called as a witness, the inference must be against the state and not against the defendant. He argues that not to do so is to shift the burden of proof onto the defendant. We disagree. As already noted, there is no evidence except defendant's testimony that he left the house at all between 10:30 p.m. on September 23 and 1:30 a.m. on September 24. When defendant testified he was not with Mackie during this period, thus creating the third-party intruder-possibility, he was, in effect, establishing an alibi defense for this critical period of time which, according to his theory, must have been the time when the fatal blow was struck. One asserting an alibi defense is required to come forward with evidence as to the alibi itself. *State v. Pam*, 1 Wn. App. 723, 463 P.2d 200 (1969), *State v. Rosi*, 120 Wash. 514, 208 P. 15 (1922). By his failure to subpoena and examine an available witness to support his alibi, defendant not only failed to support his defense to the extent of establishing a reasonable doubt, but also permitted the trier of the facts to con-

clude that the alibi witness, if called, would give testimony unfavorable to him. See *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968).

■ Defendant also argues that the fact the trial court did not believe the defendant cannot be used as a substitute for evidence that he struck the fatal blow. We agree. However, it is not disputed that our Supreme Court has adopted the general rule that circumstantial evidence, alone, will support a criminal conviction. See *State v. Mevis*, 53 Wn.2d 377, 333 P.2d 1095 (1959), *State v. Schrager*, 74 Wn.2d 75, 442 P.2d 1004 (1968).

■■ Although the circumstantial evidence in the case must be consistent with the hypothesis that the accused is guilty, and inconsistent with any reasonable hypothesis or theory of his innocence (*State v. White*, 74 Wn.2d 386, 444 P.2d 661 (1968)), whether or not the circumstantial evidence excludes every reasonable hypothesis consistent with the appellant's innocence is a determination properly made by the trier of the facts. *State v. Grenz*, 26 Wn.2d 764, 175 P.2d 633 (1946), *appeal dismissed*, 332 U.S. 748, 92 L. Ed. 336, 68 S. Ct. 54 (1947); *State v. Donckers*, 200 Wash. 45, 93 P.2d 355 (1939). This court's only function on appeal is to determine if there is substantial evidence in the record tending to establish circumstances upon which a finding of guilt can be predicated. *State v. Long*, 44 Wn.2d 255, 266 P.2d 797 (1954).

We find substantial evidence in the record establishing circumstances upon which the trial court's finding of guilt of the defendant were properly predicated.

Judgment affirmed.

GREEN and MUNSON, JJ., concur.