Garland HICKS, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 680S186A.

Supreme Court of Indiana.

Oct. 8, 1981.

Andrew V. Giorgi, Merrillville, for appellant.

Linley E. Pearson, Atty. Gen., Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted of Murder, Ind.Code § 35–42–1–1 (Burns 1979), after trial by jury and sentenced to fifty (50) years imprisonment.

This direct appeal presents the following issues:

(1) Whether the verdicts rendered by the jury were inconsistent.

(2) Whether the State failed to prove the cause of death of one of the victims.

(3) Whether the trial court erred in not ordering a new trial because of newly discovered evidence.

\* \* \*

## ISSUE I

On September 22, 1978, the Lake County Grand Jury returned indictments charging the defendant, along with James Allen, Dirk Webster, and O. D. Webster, with two counts of Murder. Count I charged that the four shot Betty DeBowles, and Count II charged that they stabbed, beat, and drowned Robin Thomas.

The evidence most favorable to the State reveals that on December 16, 1977, James Allen, Dirk Webster, and the defendant, all of whom were armed,[1] went to the home of Deon and Yvette Thomas. Deon Thomas is Robin Thomas' brother. When they arrived Robin was there with Betty DeBowles. While at the house, the defendant hit Robin across the head with his gun.[2] Thereafter, the defendant, Allen, Yvette Thomas, Webster, and the two victims drove around in Robin's automobile. Allen decided that Yvette should be taken home, and she was. The remainder of the group departed in Robin's automobile. This was the last time that Yvette saw Robin and Betty alive.

The bulk of the evidence against the defendant came from James Allen, who pled guilty to two counts of Manslaughter and agreed to testify against the defendant, in exchange for a recommendation by the State of a sentence of six (6) years imprisonment and dismissal of unrelated charges.

Allen, as a courier for O. D. Webster, had supplied Robin Thomas with cocaine and marijuana. Robin, in turn, had sold these controlled substances. On the day of the murders, it was arranged that Allen, the defendant and Dirk Webster were to deliver Robin to O. D. Webster because he owed O. D. seven to eight hundred dollars for narcotics. Allen testified that O. D. had

---

1. Yvette Thomas testified that Allen carried a .45 automatic, and Dirk and the defendant each had a .38. Allen testified that he carried a .45 automatic; Dirk carried a .32 revolver; and the defendant had a .32 revolver and a .38.

2. This is Yvette's testimony. Allen testified that he and the defendant "pistol whipped" Robin on the head.

given instructions not to leave anyone at the Thomas house when they picked up Robin but that he took Yvette home, "Because I didn't want her mixed up in this."

After releasing Yvette, they drove to Sixth and Martin Luther King Streets to meet O. D. Webster. O. D. conferred with Robin and Betty in a basement of an unidentified building and out of Allen's presence. O. D. instructed his cohorts to take Robin and Betty to Third and Durbin, the location of Dirk Webster's house. They remained there a half hour, whereupon the defendant told Allen that they had to take Robin and Betty elsewhere. Dirk Webster then directed Allen to drive to the location of a little drainage ditch bridge near Cline Avenue. Allen was driving; Betty sat next to him in the front seat, and Dirk sat next to Betty. Robin and the defendant were in the back seat. When the vehicle stopped, Robin, the defendant, and Dirk got out, but Betty refused to do so. Robin attacked Dirk, and the defendant pulled him off and forced him to walk away from the scene. Dirk then fired three times at Betty, killing her.

While using a rag to wipe off fingerprints, Allen heard four shots from the direction in which the defendant had taken Robin. Robin, however, managed to escape, and the group fled upon the approach of another vehicle, which they believed to be the police. In the midst of the flight, the defendant lost his .32 gun, and Allen threw his gun and the keys to the automobile onto a passing train.

The three returned to the scene of the shootings to look for Robin. The defendant thought that Robin had gone off into the water filled ditch which ran into a tunnel, so Dirk went to one end of the tunnel and the defendant and Allen went to the other. The defendant fired two shots into the tunnel and then pulled Robin out of the water. A struggle ensued between the defendant and Dirk, and Robin. The defendant directed Allen to find a brick, but the defendant then found a bottle, broke it, and slashed Robin's throat twice. He and Dirk then held Robin under the water until he was dead.

Thereafter, O. D. Webster picked up the defendant, Allen, and Dirk near the scene of the murders. O. D. gave Allen three hundred dollars ($300.00) worth of marijuana and paid the defendant and Dirk five hundred dollars ($500.00) each for their services.

The jury returned a verdict of Not Guilty with respect to the Murder of Betty DeBowles and a verdict of guilty with respect to the Murder of Robin Thomas. Defendant contends that these verdicts are inconsistent and contrary to law, because the State's evidence shows that both homicides were committed at the same time.

This Court's statements, in its decisions disposing of claims of inconsistent verdicts have not been entirely consistent. In *Flowers v. State*, (1943) 221 Ind. 448, 450, 48 N.E.2d 56, 57 we adopted the rule of *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 358–59, which treats each count of an indictment as if it were a separate indictment and therefore does not require verdicts to be consistent.

In *Marsh v. State*, (1979) Ind., 393 N.E.2d 757, 760, 761, we stated:

"While the *Flowers* case has never been overruled, we note that this Court and the federal courts have consistently taken care to establish that verdicts are in fact not inconsistent." * * *

" * * * While never having reversed a case on the basis of inconsistent verdicts, this Court has consistently evinced concern over the possibility of inconsistent verdicts when faced with the issue by establishing that the verdicts are in fact not necessarily inconsistent." (citations omitted.)

Another line of cases, which commenced before the decision in *Marsh* and continued thereafter, endorses the *Dunn* rule without qualification. *Smith v. State*, (1979) Ind., 388 N.E.2d 484, 487; *Walton v. State*, (1980) Ind., 398 N.E.2d 667, 670; *Grimm v. State*, (1980) Ind., 401 N.E.2d 686, 688–89 (alternative holding); *Wells v. State*, (1980) Ind. App., 401 N.E.2d 779, 781.

In *Smith* the Court cited *Flowers, supra,* and *Pierce v. State,* (1977) 267 Ind. 240, 369 N.E.2d 617, where we determined without citation to authority that the verdicts were consistent. In *Pierce* we stated that it is not within our province to attempt to interpret the thought process of the jury in arriving at their verdict. We believe that this is a correct statement of the law.

In the past we have given the jury great leeway to convict the defendant of a lesser included offense, where he contended that the evidence supported only an absolute acquittal or a conviction for the greater offense. *Hasenfuss v. State,* (1901) 156 Ind. 246, 59 N.E. 463 (murder/manslaughter); *Duffy v. State,* (1900) 154 Ind. 250, 252, 56 N.E. 209 (robbery/larceny).

> "The jury, under our Constitution, being the exclusive judges of both the law and the facts in a criminal case, and having the power, as we have said, to find a defendant guilty of manslaughter under a charge of murder in the first degree, may, if they so determine, abuse such power, or improperly exercise it, and return a verdict for manslaughter upon a trial of murder in the first degree, although the facts proved in the case conclusively establish beyond any reasonable doubt the guilt of the accused of murder in the first degree." *Hasenfuss v. State,* (1901) 156 Ind. 246, 251, 59 N.E. 463.

We also have allowed the jury to exercise this discretion in cases where a single criminal transaction involving one defendant may be used to support charges of distinct and separate offenses. *Abrams v. State,* (1980) Ind., 403 N.E.2d 345, 347; *Pulliam v. State,* (1976) 264 Ind. 381, 395–96, 345 N.E.2d 229, 240–41; *Livingston v. State,* (1972) 257 Ind. 620, 624, 277 N.E.2d 363, 365; *Buckner v. State,* (1969) 252 Ind. 379, 384, 248 N.E.2d 348, 352.

The reason for allowing the jury to render verdicts, that are seemingly inconsistent, inheres within our system of jurisprudence. The jurors are the triers of fact, and in performing this function, they may attach whatever weight and credibility to the evidence as they believe is warranted.

A jury verdict of acquittal is binding no matter how strong the State's evidence is against the accused. While the jury might have been able to find from the evidence related above, that the defendant aided and abetted the murder of Betty DeBowles, it was not required to do so.

## ISSUE II

Defendant next contends that the State failed to prove the cause of death of Robin Thomas. Dr. Custodio, the pathologist who performed the autopsy on Robin, was not able to say for certain whether Robin was drowned or died from exposure to the cold. Defendant cites *Palace Bar, Inc. v. Fearnot,* (1978) 269 Ind. 405, 381 N.E.2d 858 and *Reed v. State,* (1979) Ind. App., 387 N.E.2d 82 for the proposition that Dr. Custodio's testimony is, therefore not adequate to establish the cause of death.

We have held that medical testimony is not a prerequisite to establishing the cause of the victim's death. *Brewer v. State,* (1981) Ind., 417 N.E.2d 889, 892. As related above, James Allen, an eyewitness, provided testimony from which a jury could reasonably infer that the defendant, assisted by another, held the victim under water until he expired. A jury may infer the cause of death of a victim from the testimony of an eyewitness. *Greenwade v. State,* (1980) Ind., 408 N.E.2d 542, 544–45; *Colbert v. State,* (1978) 268 Ind. 451, 453, 376 N.E.2d 485, 486; *Morris v. State,* (1977) 266 Ind. 473, 482, 364 N.E.2d 132, 138, *cert. denied,* (1977) 434 U.S. 972, 98 S.Ct. 526, 54 L.Ed.2d 462.

## ISSUE III

Defendant contends that the trial court erred in failing to grant a new trial upon the basis of newly discovered evidence. The newly discovered evidence consists of the testimony of four witnesses that on separate occasions, while they were cellmates of Allen in the Lake County Jail, Allen stated his intention to "pin the murders" on the defendant. Additionally, there were two other cellmates of Allen who related conversations about "pinning the mur-

ders" on a third party. Defendant also offered the testimony of Dirk Webster and O. D. Webster, both of whom stated that they had not known Defendant prior to December, 1978.

To sustain a claim for a new trial based on newly discovered evidence, a defendant must show (1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that it could not, by due diligence, have been discovered in time for trial; (7) that it is worthy of credit; (8) that it can be produced upon a retrial of the case; and (9) that it will probably produce a different result. *Bradburn v. State*, (1981) Ind., 425 N.E.2d 144.

At the hearing on the motion for a new trial, Defendant admitted that one Leroy Spence had told him prior to the trial that Enzie Moore and Charles Kelly had information about a conspiracy against him. Both Moore and Kelly testified concerning Allen's intention to perjure himself, as did four other witnesses, who testified that they had not told the defendant what they knew prior to trial. Defendant testified on cross-examination as follows:

"Q Did he tell you it was just those two, Moore and Kelly who knew something?

"A He said those were the two that had mentioned to him at the time they were aware of the conspiracy and also said there were some more, you know.

"Q So you knew about this before—or before the trial was over?

"A Yes, right. I mentioned this to Mr. Clement. [the trial judge]

"Q Before the trial was over?

"A The day they picked the jury. I come down here and mentioned in this courtroom in front of him.

"Q Did you give him the names of Charles Kelly and Enzie Moore?

"A No I didn't.

"Q Did he ask for them?

"A No, not that I can recall.

"Q Why didn't you tell him the names?

"A I don't remember—because I was in such uproar due to the fact I was involved, and really my whole thing was off track at the time. I went through a great amount of strain in regards to this. I felt deep in my heart it was unjust."

Moore also testified that he told the defendant that a guy was trying to "put a murder case on him" and that the defendant said, "Well, I hadn't been involved."

The trial court's denial of a motion for a new trial will be overturned only upon a showing of an abuse of discretion. *Washington v. State*, (1979) Ind., 390 N.E.2d 983, 989.

The evidence concerning Allen's prior statements would serve only to impeach him. *Bradburn v. State*, (1971) 256 Ind. 453, 459, 269 N.E.2d 539, 543; *Mavrick v. State*, (1965) 247 Ind. 77, 81, 210 N.E.2d 426, 428; *Guffey v. State*, (1979) Ind.App., 386 N.E.2d 692, 694–95. Additionally, from the record, the trial court could have found that Defendant had been aware of the identities of several of these witnesses and of the information that they possessed and, yet, took no steps to locate or subpoena them. *Bradburn v. State*, (1981) Ind., 425 N.E.2d 144; *See Riddle v. State*, (1980) Ind., 402 N.E.2d 958, 961. We find no abuse of discretion in the trial court's denial of the motion for a new trial.[3]

---

**3.** Defendant's reliance upon *Key v. State*, (1956) 235 Ind. 172, 132 N.E.2d 143, in which we overturned the denial of a motion for a new trial, is misplaced. In *Key* the prosecution's witness expressed an intent to perjure himself to his jailer, a deputy sheriff. We expressly found from the record that the defendant did not learn of this evidence until after the trial, a fact which the State did not contest. *Id.* at 179, 132 N.E.2d at 147. In the case at bar, it would not be unreasonable for the trial court to have concluded that Defendant had knowledge of the alleged newly discovered evidence, and that he did not take steps to obtain a continuance at the appropriate time in order to find the witnesses.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C. J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.