**Darrell Glenn WOODRUM,
Defendant-Appellant,**

v.

**STATE of Indiana, Plaintiff-Appellee.**

**No. 22A01-8602-CR-47.**

Court of Appeals of Indiana,
First District.

Oct. 30, 1986.

J. Patrick Biggs, New Albany, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Office of the Atty. Gen., Indianapolis, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, Darrell Glenn Woodrum (Darrell), appeals the decision of the Floyd Superior Court, which sentenced him to eight years' imprisonment for involuntary manslaughter, a Class C felony, based on jury verdicts finding him guilty of the offenses of involuntary manslaughter, battery, and reckless homicide.

We affirm and remand.

## STATEMENT OF THE FACTS

Darrell met Janna Jo Sensinger (Janna) at Indiana Vocational and Technical College in the early summer of 1984. Both worked at the college, Darrell as an electronics instructor and Janna as a secretary. At this time, Janna had been separated from her husband, and she was living in a house with her daughter, Meghann, born December 16, 1982, the victim-decedent. Darrell was divorced and had custody of his daughter, Chari, around 4 years old. Around the beginning of October 1984, Darrell and Chari moved in with Janna and Meghann. Meghann died on January 15, 1985. Janna's divorce was finalized on February 28, 1985, and Darrell and Janna married on March 2, 1985.

After Darrell and Chari moved into Janna's residence, Darrell and Janna made several attempts to acclimate the children toward each other and the adults in order to establish a family household setting. Darrell and Janna read several books on the subject and made several agreements designed to raise and discipline the children equally.

Since Meghann was very possessive of her mother and usually preferred her mother's assistance when she was present, Darrell and Janna agreed Darrell should try to assist Meghann out of Janna's presence. On the morning of Meghann's death, Darrell was alone with Meghann trying to get her dressed. Meghann began to cry and Janna entered the room. Darrell became upset with Janna for coming into the room, breaching their agreement. Darrell then threw a T-shirt on a pile of clothes, which irritated Janna. After Janna finished dressing Meghann, Janna and Darrell took the children to the car in order to take them to a day-care center on their way to work. Chari got in the back seat first, and Janna pushed her over to make room for Meghann. Darrell then became irritated and switched the girls' positions in the seat. Janna then took Meghann out of the car, said she wasn't going to work, and started for the house. Darrell stopped her, they discussed the situation, and she returned to the car with Meghann. After dropping the children off at the day-care center and going to work, Darrell and Janna discussed the incidents that morning and over lunch, and resolved their differences.

The day-care center was operated by Diane Haffield, and it was located in the remodeled basement of Diane and Jerry Haffield's house. Diane was in charge of the day-care center for approximately three years. Kim Hartlauf started babysitting on a full-time basis when Diane was hospitalized in early January 1985, but she had acted as a part-time substitute babysitter for about four months prior. Kim testified that the average age of children at the day-care center ranged from two to four years old, plus her son who was five.

On the day of Meghann's death, the girls were fine when they arrived at the day-care center. Kim testified that there were approximately ten children at the day-care center on that day. Kim stated Meghann gritted her teeth all day and that was the only time she ever saw Meghann do that. Janna later testified that Meghann gritted her teeth all the time. Otherwise, Kim testified that Meghann was in good health all day. She changed Meghann's diapers three times during the day; she did not notice any bruises, she did not notice any discomfort or distress, and she did not notice any crying during the day. Kim had seen Darrell pick up the children on only one other occasion. When he arrived on that day, Meghann cried, appeared terrified of Darrell, and didn't want to go home. Kim dressed Meghann and persuaded her

to go as Darrell wrote out a check for the day-care services.

Darrell left work at 5:00 p.m., and it took him about twenty minutes to arrive at the day-care center. He spent approximately fifteen minutes at the day-care center, and it took five to ten minutes to drive the girls home. Darrell testified that once home he left the girls' coats on, gave them some candy, and told them to play while he made a few phone calls. He called Janna, a potential employer, then Janna again. When Darrell was on the phone, he said Chari came up to him and said Meghann was throwing up. After he was off the phone, Darrell checked Meghann but did not notice any signs that she had thrown up. Nevertheless, Darrell took a towel for the ride back to pick up Janna in case Meghann threw up in the car. The ride back to the college took thirty minutes. Darrell took the children to his office so he could put some work away and so they wouldn't interfere with Janna as she was trying to finish. Darrell testified that it wasn't until they reached his office that he noticed something wrong with Meghann. Darrell then called Janna and indicated something was wrong; Janna spoke with Meghann over the phone and then went to Darrell's office.

When Janna arrived she said they needed to take Meghann to the hospital. Janna testified that Darrell's opinion was that, since he never took Meghann's coat off, she was only hot and sleepy. Nevertheless, Darrell agreed they should go to the hospital, and even scolded Chari to get her to hurry. The hospital records at Clark County Hospital indicate Meghann was admitted to the emergency room at 6:48 p.m.

Dr. Edward Schroeter was the emergency room physician who initially treated Meghann. He noticed Meghann was not breathing when she arrived, and after resuscitating her, he also noticed she had cuts on the inside of her lip and faint bruises around her navel. Dr. Schroeter was provided with a medical history and ran several tests on Meghann, none of which proved conclusive. He also conferred with other doctors at the emergency room. Based on the medical history provided by Darrell and Janna, Meghann was essentially treated wrongly for the first forty-five minutes, as her condition did not improve. It was then decided that Meghann must have internal bleeding, and she was transferred to Children's Hospital in Louisville, Kentucky, at 8:05 p.m.

Dr. Schroeter went with Meghann to Children's Hospital, and Dr. Diller B. Graff performed surgery around 9:45 p.m. Dr. Graff testified that the mesentery around her bowel was torn, and since she had lost so much blood, it would no longer clot. She essentially bled to death in surgery around 11:40 p.m.

Dr. Douglas Ackerman performed an autopsy on Meghann's body, which showed that the cause of death was an acute, blunt trauma to the abdomen. He stated he found circular bruises in the abdomen, two sets of four, which led him to the opinion that Meghann was struck twice by a fist in the abdomen. A forensic pathologist also stated that the force causing the injury could not have been inflicted by a person less than ten years of age.

Several opinions were expressed as to when the injuries occurred. Dr. Schroeter testified that the internal injuries occurred an hour to an hour-and-a-half before Meghann arrived at the emergency room. Another doctor stated the injuries should have occurred minutes to hours prior to emergency room treatment. Finally, an investigating detective stated a pathologist told him the injuries occurred two to twelve hours from the time they were looking at Meghann's remains, which would have been after death. Two of the doctors who testified stated it was difficult to pinpoint the exact time the injuries were sustained. Regarding the cuts on the inside of Meghann's lip, Dr. Schroeter testified they occurred within a half-hour before Meghann arrived at the emergency room. He observed that because there had been no maceration or watering of the cuts as usually happens, they were fresh cuts. Other doctors testified that since there

were no corresponding bruises on the outside of the lips, the injuries on the inside were consistent with placing a hand over the mouth with firm, direct pressure on the lips.

Janna was called to testify for both the State and Darrell. She did not believe that Darrell caused Meghann's injuries. She testified that Darrell even scolded her not to hit the girls in the face when disciplining them. However, Janna's father testified that Janna told him that she would stay with Darrell even if he did it. Janna's mother also testified that at one point, Janna wanted her to take Meghann to Florida with her and offered to pay support. Other pertinent facts will be discussed below.

### ISSUES

Darrell presents the following issues for our review:

    I.  The verdicts were not supported by facts presented at trial of this matter.

   II.  The verdicts were contrary to law in that defendant was found guilty by the jury of the mutually exclusive offenses of reckless homicide and involuntary manslaughter and battery, a Class C felony, by striking Meghann M. Sensinger in the abdomen with his fist, because, by law, defendant could not have acted knowingly and recklessly in the same act.

  III.  The court erred in not granting defendant's motion for a mistrial following the prosecutor's emotional and highly prejudicial outburst in front of the jury, which was directed at the defendant as he was testifying at trial.

### DISCUSSION AND DECISION

#### ISSUE I: *Sufficiency of the Evidence*

Darrell was found guilty by a jury of the offenses of involuntary manslaughter, battery and reckless homicide; and the trial court entered judgment of conviction and sentenced him on the offense of involuntary manslaughter. Under IND.CODE 35–42–1–4:

> "A person who kills another human being while committing or attempting to commit:
>
>     *     *     *     *     *     *
>
> (3) battery;
>
> commits involuntary manslaughter, a Class C felony."

The predicate offense, battery, consists of "knowingly or intentionally touching another in a rude, insolent, or angry manner." IND.CODE 35–42–2–1. These culpability requirements mean it must be shown Darrell committed the battery at least knowingly; that he engaged in conduct and be "aware of the high probability that he is doing so." IND.CODE 35–41–2–2(b). This case was admittedly based upon circumstantial evidence since no one testified as an eyewitness to an underlying offense of battery.

██ In our review of the sufficiency of the evidence, we do not weigh the evidence or judge the credibility of witnesses, and we consider only that evidence most favorable to the State and all reasonable inferences to be drawn therefrom. *McCraney v. State* (1983), Ind., 447 N.E.2d 589; *Phelps v. State* (1983), Ind.App., 453 N.E.2d 350. The findings of the trier of fact will not be disturbed when there is substantial evidence of probative value to support the conviction. *Phelps, supra.* The conviction may be sustained on circumstantial evidence alone, which need only produce an inference reasonably tending to support a finding of guilt. *McCraney, supra; Phelps, supra.*

██ In our assessment of the sufficiency of the evidence, we are also guided by other principles of law. Our supreme court has held that mere presence at the commission of a crime is not sufficient by itself to support a verdict, but it is a circumstance which a jury may consider in determining a defendant's guilt. *See Dorton v. State* (1981), Ind., 419 N.E.2d 1289; *Pinkler v. State* (1977), 266 Ind. 467, 364 N.E.2d 126. Presence at the scene of a crime in connec-

tion with other circumstances tending to show participation in the crime may provide sufficient evidence. *Richards v. State* (1985), Ind., 481 N.E.2d 1093; *Harris v. State* (1981), Ind., 425 N.E.2d 154; *Dorton, supra.* Most of these cases considering the issue of mere presence or mere opportunity have involved robbery or burglary charges, and circumstantial evidence in addition to mere presence or mere opportunity supported sufficient evidence of a defendant's culpability.

Mere opportunity to commit the crime of involuntary manslaughter on a child was recently addressed by us in *Phelps, supra.* In this case we analyzed *People v. Kinzell* (1969), 106 Ill.App.2d 349, 245 N.E.2d 319; *State v. Pennewell* (1979), 23 Wash.App. 777, 598 P.2d 748; and *State v. Green* (1970), 2 Wash.App. 57, 466 P.2d 193, and found several consistent underlying similarities in the evidence presented. In each of these cases, including *Phelps*, the trier of fact was presented with a situation where persons other than the defendant had the access or opportunity to inflict fatal injuries on a child. Explanations given by the various defendants were contrary to or inconsistent with medical assessment of the injuries. Also present in each case were facts from which the trier could conclude that the fatal injuries occurred while the child was in the exclusive custody of the defendant. In each case, these and other circumstances led to the conclusion that the defendants had more than a mere opportunity and supported sufficient circumstantial evidence of the defendants' culpability.

In the case at bar, several persons had the access or opportunity to inflict Meghann's injuries: people at the day-care center, Darrell, or Janna. The evidence was undisputed that Meghann was in good health the entire time she was at the day-care center; there was no evidence indicating that she was injured there on that day. The baby-sitter, Kim, testified she changed Meghann's diaper three times that day, and although Meghann's bruises at the emergency room were faint, Kim noticed no bruises on Meghann that day nor did she notice Meghann having any discomfort. When Darrell came to pick her up, it wasn't the baby-sitter or day-care center that frightened her. In fact, she wanted to stay and not go home with Darrell. According to Darrell's own testimony, he did not notice anything wrong with Meghann until later, when he returned to his office with the children to pick up Janna. By this time it was apparent that Meghann was seriously ill; Meghann's illness was the reason why Janna immediately came to Darrell's office. It took only a few minutes to get Meghann to the hospital. The jury had the opportunity to observe the demeanor and assess the credibility of the witnesses, including Kim Hartlauf and Jerry Haffield from the day-care center, Janna and Darrell. The jury was entitled to believe Meghann was in good health at the time Darrell took possession of her at the day-care center and was ill by the time Janna next saw her.

There was conflicting medical evidence as to when Meghann's injuries could have occurred. Meghann's injuries were extensive and severe, caused by someone older than ten-years old striking her in the abdomen twice by a fist. Dr. Schroeter was the initial doctor who treated Meghann in the emergency room, he followed her to Children's Hospital, and he was there when she died. He testified that Meghann's injuries occurred an hour to an hour-and-a-half prior to her arrival at the emergency room. He also testified that the cuts on her lip were even more recent, only about a half-hour old, and other doctors testified that these injuries were consistent with someone placing a hand over her mouth and pressing firmly. Meghann was in Darrell's exclusive custody starting at the day-care center around 5:20 p.m. until Janna joined them shortly before Meghann was admitted to the emergency room at 6:48 p.m. According to the time frame given by Dr. Schroeter, Darrell had not the mere opportunity to inflict the injuries but the *sole* opportunity.

Our supreme court has found more than a mere opportunity to commit a crime

where a person has the sole or exclusive opportunity to do so. It has held exclusive opportunity to be almost conclusive evidence of guilt. *See Hutchinson v. State* (1967), 248 Ind. 226, 225 N.E.2d 828; *Mobley v. State* (1949), 227 Ind. 335, 85 N.E.2d 489. Exclusive control over a child prior to the murder of a child was addressed in *Mobley, supra,* at 341, 85 N.E.2d at 491:

> "This undenied condition of the body, together with the fact that the child had been in the exclusive custody of the appellants for several weeks and had gone to the hospital directly from them, was almost conclusive evidence to sustain the verdict against one or both defendants."

Exclusive control over the child during the time the injuries were believed to occur was an important factor in *Phelps, supra,* and the other cases cited therein. *See also Davis v. State* (1985), Ind.App., 476 N.E.2d 127 (holding that evidence of a mother's sole control over her baby supported a reasonable inference that she abandoned him or placed him in a situation that endangered his health).

■ Other medical opinions indicated the injuries could have occurred during the time Meghann was in Darrell's exclusive custody or possibly sometime earlier since an exact time was difficult to pinpoint. These conflicts were for the jury to resolve; we do not reweigh the evidence. When a conviction is based in whole or in part on circumstantial evidence, we do not search to find that such evidence eliminates every reasonable hypothesis of innocence; rather, we need only find that an inference may reasonably be drawn which supports the finding of the jury. *Armstrong v. State* (1982), Ind., 429 N.E.2d 647; *Dorton, supra.*

■ In *Phelps, supra,* and the cases cited therein, medical testimony was inconsistent with the accounts given by the defendants. In the case at bar, there was no explanation given at trial to account for the injuries, as all parties with an opportunity denied any criminal act. However, in both Darrell's testimony at trial and his statement given to the police, which was admit-

ted into evidence at trial, he gave no indication that Meghann was ill when he picked her up at the day-care center, but stated he first noticed Meghann was ill over an hour later when he arrived at his office. No explanation at all was given for the cuts on Meghann's inner lips, which occurred about a half-hour before she arrived at the emergency room. Also admitted into evidence was the emergency room hospital record. According to the medical history, Meghann was "doing fair this a.m., was ill appearing with temperature of 101° and weak when picked up at baby-sitters." Dr. Schroeter also testified that the history he got when initially treating Meghann was that "when she'd been picked up that evening she'd been little lethargic and, and ill appearing and had it had rapidly progressed over several hour period prior to her arrival in the Emergency Room." Again, it was for the jury to reconcile these differences. We hold the evidence presented provides more than a mere opportunity; Darrell's exclusive custody during the time injuries were believed to occur and other circumstantial evidence provided reasonable inferences from which a jury could conclude Darrell entertained the requisite culpability and committed the offense.

## ISSUE II: *Inconsistent Verdicts*

■ Darrell was convicted by a jury of involuntary manslaughter and battery, requiring a knowing state of mind, and reckless homicide, requiring a reckless state of mind. Apparently, he argues that a jury could not find he possessed a knowing and reckless state of mind for the same act; he alleges they are mutually exclusive. Darrell claims that the error did not somehow manifest itself until after the verdicts were returned, and the trial court, at sentencing, allegedly erred along the same lines. He concedes to the State's characterization of his argument as an alleged error in returning logically inconsistent verdicts.

The standards for evaluating alleged inconsistent verdicts was stated in *Brinker v. State* (1986), Ind.App., 491 N.E.2d 223, 226:

"While the differing verdict may appear anomalous in the first instance, we do not speculate on inconsistent jury verdicts. *Dorsey v. State* (1986), Ind., 490 N.E.2d 260, 269; *Hicks v. State* (1981), Ind., 426 N.E.2d 411, 414. It is not within our purview to attempt to interpret the thought process of the jury. *Douglas v. State* (1982), Ind., 441 N.E.2d 957, 962. Consistency in the verdict is not necessary. Each count is regarded as if it were charged separately. *Dunn v. United States* (1931), 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356; *Hicks,* 426 N.E.2d at 413; *Douglas,* 441 N.E.2d at 962; *Anderson v. State* (1983), Ind. App., 452 N.E.2d 173, 177. That the verdict may have been the result of a compromise is possible, but the verdict cannot be upset by speculation or inquiry into such matters. *Dunn,* 284 U.S. at 394, 52 S.Ct. at 191; *see also Sylvester v. State* (1985), Ind., 484 N.E.2d 1."

Darrell concedes he was properly charged, and as quoted above, each count is regarded as if it were charged separately. As long as there is sufficient evidence to support a conviction on one charge, it will not be disturbed. Since we hold, above, that there was sufficient evidence to support the involuntary manslaughter charge, Darrell's argument here is without merit.

We note that the trial court entered judgment of conviction and sentenced Darrell on the involuntary manslaughter charge only and let the other verdicts stand. To clarify and eliminate any further confusion, these other counts should be vacated by virtue of *Hall v. State* (1986), Ind., 493 N.E.2d 433, and we remand for this reason only.

ISSUE III: *Prosecutorial Misconduct*

Darrell testified on his behalf at trial, and, on cross-examination by the prosecutor, Darrell stated that he believed the injury that caused Meghann's death occurred while she was at the baby-sitter's. According to Darrell, the prosecutor then leaped from the table where he was seated and the following colloquy ensued:

"Q. You didn't hit Meghann! (Prosecutor gets up from counsel table abruptly banging into table).

A. No sir, I did not.

MR. BIGGS: Your Honor.

[Darrell's attorney]

Q. Did you come for justice—(Prosecutor pounds hand on table).

MR. BIGGS: Your Honor!

Q. —at this Court House?

MR. BIGGS: Your Honor, I move for a mistrial. I move for a mistrial right now, an outburst like that is totally uncalled for.

JUDGE STRIEGEL: All right, just a second.

MR. BIGGS: Pounding on the table.

JUDGE STRIEGEL: Let's take a recess.

JURY ADMONISHED AND RETIRES TO JURY ROOM."

Darrell then moved for a mistrial based on what he characterized as the prosecutor's emotional and highly prejudicial outburst in front of the jury, which was unprofessional conduct and communicated to the jury the personal opinion of the prosecutor. No objection was made to the questions asked or the answers given. The trial court denied the motion and told the prosecutor he was "out of line." The trial court later admonished the jury to disregard the prosecutor's outburst, and admonished the prosecutor to refrain from such conduct for the rest of the trial.

The decision to grant a motion for mistrial based on alleged prosecutorial misconduct lies within the sound discretion of the trial court. *Palmer v. State* (1985), Ind., 486 N.E.2d 477. We must determine whether the prosecutor's statements did indeed constitute misconduct, and whether the misconduct, if any, placed the defendant in a position of grave peril. *Isom v. State* (1985), Ind.App., 479 N.E.2d 61. Even assuming, arguendo, that the prosecutor's statements and actions here constituted misconduct, Darrell does not show that such action put him in a position of grave peril. This standard is measured by the probable persuasive effect the alleged misconduct had on the jury's decision and

whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant. *Bixler v. State* (1984), Ind. 471 N.E.2d 1093, *cert. denied,* (1985) —— U.S. ——, 106 S.Ct. 106, 88 L.Ed.2d 86. We will reverse where the evidence is close and the court does not counter the persuasive effect of the prosecutor's alleged misconduct by admonishing the jury. *Isom, supra.* Where the court adequately admonishes the jury and the prosecutor, which cures any alleged error, the extreme action of a mistrial is not warranted. *Palmer, supra.*

The actions and statements by the prosecutor here did not put Darrell in a position of grave peril, especially in light of admonishments given by the court. The prosecutor did not repeat any instances of alleged misconduct. Accordingly, the trial court was correct in denying Darrell's motion for mistrial.

Judgment is remanded to the trial court as directed in Issue II, and in all other respects, judgment is affirmed.

ROBERTSON, P.J., and RATLIFF, J., concur.